# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP1887 |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the mental commitment of K.E.K.: |
| | Waupaca County, |
| |        Petitioner-Respondent, |
| |    v. |
| | K.E.K., |
| |        Respondent-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 389 Wis. 2d 104,936 N.W.2d 405
(2019 – unpublished)

| | |
|---|---|
| OPINION FILED: | February 9, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 17, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Waupaca |
|   JUDGE: | Vicki L. Clussman |

JUSTICES:
ZIEGLER, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined. DALLET, J., filed a dissenting opinion, in which KAROFSKY, J., joined
NOT PARTICIPATING:

ATTORNEYS:
For the respondent-appellant-petitioner, there were briefs filed by *Colleen D. Ball*, assistant state public defender. There was an oral argument by *Colleen D. Ball*.


For the petitioner-respondent, there was a brief filed by *David G. Been*, Waupaca corporation counsel. There was an oral argument by *David G. Been*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.  2018AP1887
(L.C. No.  2017ME44)

STATE OF WISCONSIN          :         IN SUPREME COURT

**In the matter of the mental commitment of K.E.K.:**

**Waupaca County,**

        **Petitioner-Respondent,**

    **v.**

**K.E.K.,**

        **Respondent-Appellant-Petitioner.**

**FILED**

**FEB 9, 2021**

Sheila T. Reiff
Clerk of Supreme Court

ZIEGLER, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and HAGEDORN, JJ., joined.  DALLET, J., filed a dissenting opinion, in which KAROFSKY, J., joined.

REVIEW of a decision of the Court of Appeals.  *Affirmed.*

¶1  ANNETTE KINGSLAND ZIEGLER, J.  This is a review of an unpublished decision of the court of appeals, Waupaca Cnty. v. K.E.K., No. 2018AP1887, unpublished slip op. (Wis. Ct. App. Sept. 26, 2020), affirming the Waupaca County circuit court's[1]

---

[1] The Honorable Vicki L. Clussman presided.

order extending K.E.K.'s involuntary commitment[2] pursuant to Wis. Stat. § 51.20(13)(g)3. (2017-18).[3]

¶2    K.E.K. challenges the commitment extension arguing that Wis. Stat. § 51.20(1)(am), the statute upon which the County relied to prove K.E.K.'s dangerousness, is both facially unconstitutional and unconstitutional as applied to this case because the statute does not require a sufficient showing of current dangerousness as exhibited by recent acts of dangerousness.[4]   Specifically, she claims that the standard under

---

[2] Wisconsin Stat. § 51.20, as well as the case law, uses "recommitment" and "extension of a commitment" interchangeably, and we do as well.  See Portage Cnty. v. J.W.K., 2019 WI 54, ¶1 n.1, 386 Wis. 2d 672, 927 N.W.2d 509; see also Wis. Stat. §§ 51.20(13)(g)2r., 3.

[3] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

[4] We note that K.E.K.'s petition for review also included a question involving the circuit court's competency to exercise subject matter jurisdiction over K.E.K.'s extension proceeding. However, K.E.K. did not develop, nor discuss in any way, this argument in her briefs.  Accordingly, we will not consider it. See Serv. Emp. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶24, 393 Wis. 2d 38, 946 N.W.2d 35 ("We do not step out of our neutral role to develop or construct arguments for parties; it is up to them to make their case.").

2

§ 51.20(1)(am) violates due process[5] and equal protection of the laws[6] and is thus unconstitutional on its face and as applied.[7]

¶3 However, similar to an initial commitment, a recommitment requires a showing of mental illness and current dangerousness. A recommitment petition must "establish the same elements with the same quantum of proof" as an initial commitment. Waukesha Cnty. v. J.W.J., 2017 WI 57, ¶20, 375

_____

[5] K.E.K. specifically alleges that Wis. Stat. § 51.20(1)(am) violates substantive due process. Substantive due process derives from the Fifth and Fourteenth Amendments to the United States Constitution. See U.S. Const. amend. V ("No person shall . . . be deprived of life, liberty, or property, without due process of law."); amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law."). "Substantive due process provides protection from 'certain arbitrary, wrongful government actions.'" State ex rel. Greer v. Wiedenhoeft, 2014 WI 19, ¶57, 353 Wis. 2d 307, 845 N.W.2d 373 (quoting State v. Schulpius, 2006 WI 1, ¶33, 287 Wis. 2d 44, 707 N.W.2d 495).

[6] The right to equal protection of the laws arises from the Fourteenth Amendment to the United States Constitution. See U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.").

[7] K.E.K. also asserts that Wis. Stat. § 51.20(1)(am) violates the Privileges or Immunities Clause of the Fourteenth Amendment. The Privileges or Immunities Clause provides, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. K.E.K. asserts that "when [her] brief invokes substantive due process, she is also invoking the Privileges or Immunities Clause." Beyond this cursory statement, she does not develop her argument based on the text and history of the Privileges or Immunities Clause. Accordingly, we will not develop this argument and decline to entertain K.E.K.'s Privileges or Immunities Clause claims. See Vos, 393 Wis. 2d 38, ¶24.

Wis. 2d 542, 895 N.W.2d 783. The initial commitment requires proof that the individual is mentally ill, a proper subject for treatment, and currently dangerous. See Wis. Stat. § 51.20(1); Portage Cnty. v. J.W.K., 2019 WI 54, ¶16, 386 Wis. 2d 672, 927 N.W.2d 509. Section 51.20(1)(am) provides an alternative path to prove current dangerousness provided the evidence demonstrates "a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." § 51.20(1)(am).

¶4 Accordingly, we conclude that K.E.K. is unable to prove that Wis. Stat. § 51.20(1)(am) cannot be enforced under any circumstances because due process and the statute both require a showing of mental illness and current dangerousness. As such, K.E.K.'s facial due process challenge fails.

¶5 Moreover, Wis. Stat. § 51.20(1)(am) creates an alternative path to give counties a more realistic basis by which to prove current dangerousness when it is likely the committed individual would discontinue treatment if no longer committed. Thus, the state has a rational basis for treating those recommitted under § 51.20(1)(am) and those committed under § 51.20(1)(a)2.e. differently.

¶6 Finally, K.E.K.'s as-applied constitutional challenges are disguised sufficiency of the evidence challenges. Her argument is that she does not meet the statutory standard for dangerousness, not that Wis. Stat. § 51.20(1)(am) is unconstitutional when applied to K.E.K.'s specific facts.

4

¶7 Therefore, we conclude that Wis. Stat. § 51.20(1)(am) is facially constitutional and that K.E.K.'s as-applied constitutional challenges fail. Accordingly, we affirm the decision of the court of appeals.

I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶8 On November 22, 2017, Waupaca County (the County) filed an initial petition seeking to commit K.E.K. under Wis. Stat. § 51.20(1)(a)2.e., the "fifth standard."[8] On December 8,

---

[8] The "fifth standard" provides that "an individual, other than an individual who is alleged to be drug dependent or developmentally disabled," is considered "dangerous" if:

> after the advantages and disadvantages of and alternatives to accepting a particular medication or treatment have been explained to him or her and because of mental illness, evidences either incapability of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives, or substantial incapability of applying an understanding of the advantages, disadvantages, and alternatives to his or her mental illness in order to make an informed choice as to whether to accept or refuse medication or treatment; and evidences a substantial probability, as demonstrated by both the individual's treatment history and his or her recent acts or omissions, that the individual needs care or treatment to prevent further disability or deterioration and a substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety and suffer severe mental, emotional or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions. The probability of suffering severe mental, emotional or physical harm is not substantial under this subd.2.e. if reasonable provision for the individual's care or treatment is available in the community and there is a reasonable

5

2017, the circuit court held a jury trial on the County's petition for initial commitment. The jury entered the verdict that K.E.K. was mentally ill, a danger to herself and others, and a proper subject for treatment. On the basis of this jury verdict, the circuit court entered an Order of Commitment, committing K.E.K. for six months.

¶9 On May 22, 2018, the County filed a petition seeking to extend K.E.K.'s commitment. The petition alleged: (1) K.E.K. was "currently under an order of commitment"; (2) K.E.K. was "mentally ill, developmentally disabled or drug dependent, and a proper subject for treatment"; (3) K.E.K. was "dangerous because there [was] a substantial likelihood, based on [K.E.K.'s] treatment record, that [K.E.K.] would be a proper subject for commitment if treatment were withdrawn"; and (4) that "a recommitment of [K.E.K. was] recommended . . . for the protection of society, [K.E.K.], or both." Attached to the petition was an evaluation conducted by K.E.K.'s case manager.

---

probability that the individual will avail himself or herself of these services or if the individual is appropriate for protective placement under ch. 55. Food, shelter or other care that is provided to an individual who is substantially incapable of obtaining food, shelter or other care for himself or herself by any person other than a treatment facility does not constitute reasonable provision for the individual's care or treatment in the community under this subd.2.e. The individual's status as a minor does not automatically establish a substantial probability of suffering severe mental, emotional, or physical harm under this subd.2.e.

Wis. Stat. § 51.20(1)(a)2.e.

In this evaluation, K.E.K.'s case manager states, in part, "[A]t this time, this worker believes that without a commitment, [K.E.K.] would leave the facility she is living at, stop taking her medications, and repeat all behaviors that were the cause of the filing for the commitment in 2017."

¶10 The circuit court held a hearing on the extension petition on June 6, 2018.[9]  At the hearing, the court heard from the County's psychiatrist, who testified that K.E.K. "suffers from schizophrenia, paranoid type."  He further opined about K.E.K.'s actions if K.E.K. were no longer committed:

> Well, I've explained I do believe she's improved with her current treatment interventions care and safe keeping at this group home, Evergreen and with medications.  But she has distinctive lack of insight into her mental illness and that impedes her treatment in general.
>
> And so if she is off commitment or if treatment is withdrawn, she will, in my opinion, almost certainly stop her medications, she will almost certainly leave Evergreen.  She mentioned to me that she would live with family in Illinois, but her mother cited advancing age, and just being uncomfortable with the stress of this, due to her mother's age.  So I don't think she has any kind of set housing set-up. And I'm concerned that off mediations, which I believe she would stop them, and without stable housing, she would decompensate and become a proper subject for commitment, in my opinion, again.

The court also heard from K.E.K.'s case manager.  She testified that she believed "an extension is warranted because without the treatment and care that [K.E.K.'s] receiving

---

[9] The day before the extension hearing, K.E.K. waived her right to a jury trial, instead opting for a bench trial.

7

currently, . . . [K.E.K.] will no longer take her medications, become more unstable, and potentially [sic] a danger to herself as a result of that." The court also heard from the manager of K.E.K.'s group home and K.E.K. herself.

¶11  At the conclusion of the testimony, the circuit court found that K.E.K. would be a proper subject for recommitment. The court specifically found that "the county has met its burdens in showing that if treatment were withdrawn, that [K.E.K.] would be a proper subject for a commitment." Relying on the recommitment standard from Wis. Stat. § 51.20(1)(am), the court found that K.E.K. was currently dangerous and ordered her commitment be extended for 12 months.

¶12  K.E.K. appealed the circuit court's commitment extension order, challenging the constitutionality of Wis. Stat. § 51.20(1)(am). On September 26, 2019, the court of appeals affirmed, holding, in relevant part, that § 51.20(1)(am) does not violate due process facially nor as applied to K.E.K. K.E.K., No. 2018AP1887, ¶¶33-40, 46-50.

¶13  On October 30, 2019, K.E.K. petitioned this court for review. We held the petition in abeyance pending resolution of Winnebago County v. C.S., 2020 WI 33, 391 Wis. 2d 35, 940 N.W.2d 875. After this court's decision in C.S., K.E.K. filed a motion to amend her petition for review. Her new petition alleged that Wis. Stat. § 51.20(1)(am) violated due process, the

Fourteenth Amendment's Privileges or Immunities Clause,[10] and the Equal Protection Clause. We granted K.E.K.'s motion to amend her petition and granted review.

## II. STANDARD OF REVIEW

¶14 K.E.K. brings facial and as-applied constitutional challenges to Wis. Stat. § 51.20(1)(am). A facial challenge claims the law is "unconstitutional on its face." League of Women Voters of Wis. Educ. Network, Inc. v. Walker, 2014 WI 97, ¶13, 357 Wis. 2d 360, 851 N.W.2d 302 (quoting State v. Wood, 2010 WI 17, ¶13, 323 Wis. 2d 321, 780 N.W.2d 63). "Under a facial challenge, the challenger must show that the law cannot be enforced under any circumstances." C.S., 391 Wis. 2d 35, ¶14 (quoting Winnebago Cnty. v. Christopher S., 2016 WI 1, ¶34, 366 Wis. 2d 1, 878 N.W.2d 109). A statute under review is presumed constitutional when challenged facially.[11] Id.

---

[10] As we stated above, K.E.K. did not develop this argument, and we do not address her Privileges or Immunities Clause claim. See supra, ¶2 n.7.

[11] The parties dispute what burden of proof must be shown to prove a statute is unconstitutional. Relying on this court's precedent, the County argues that K.E.K. must prove the statute is unconstitutional beyond a reasonable doubt. See Winnebago Cnty. v. C.S., 2020 WI 33, ¶14, 391 Wis. 2d 35, 940 N.W.2d 875; Mayo v. Wis. Injured Patients & Families Comp. Fund, 2018 WI 78, ¶27, 383 Wis. 2d 1, 914 N.W.2d 67. Relying on federal precedent, K.E.K. counters and argues that she must only make a "plain showing" or "clearly demonstrate" that the law violates the federal Constitution. See United States v. Morrison, 529 U.S. 598, 607 (2000); Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 538 (2012). We need not resolve this dispute in this case because the law is constitutional under either standard.

¶15 "In contrast, in an as-applied challenge, we assess the merits of the challenge by considering the facts of the particular case in front of us 'not hypothetical facts in other situations.'" League of Women Voters, 357 Wis. 2d 360, ¶13 (quoting Wood, 323 Wis. 2d 321, ¶13). "[W]hile we presume the statute is constitutional, 'we do not presume that the State applies statutes in a constitutional manner.'" Mayo v. Wis. Injured Patients & Families Comp. Fund, 2018 WI 78, ¶56, 383 Wis. 2d 1, 914 N.W.2d 678 (quoting Tammy W-G. v. Jacob T., 2011 WI 30, ¶48, 333 Wis. 2d 273, 797 N.W.2d 854).

¶16 Under either type of challenge, "the constitutionality of a statute is a question of law we review de novo." C.S., 391 Wis. 2d 35, ¶13.

¶17 K.E.K.'s argument requires us to interpret Wis. Stat. § 51.20(1)(am). "[S]tatutory interpretation is a question of law we review de novo." J.W.K., 386 Wis. 2d 672, ¶10. However, we have already interpreted § 51.20(1)(am). See id., ¶¶19, 23-24. "[W]here a statute has been authoritatively interpreted by this court, the party challenging that interpretation must establish that our prior interpretation was 'objectively wrong.'" State v. Breitzman, 2017 WI 100, ¶5 n.4, 378 Wis. 2d 431, 904 N.W.2d 93; see also Johnson Controls, Inc. v. Emp'rs Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257; Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶45, 281 Wis. 2d 300, 697 N.W.2d 417.

10

## III. ANALYSIS

¶18 K.E.K. is challenging her recommitment on the basis that Wis. Stat. § 51.20(1)(am) is unconstitutional facially and as applied. Section 51.20 "governs involuntary civil commitments for mental health treatment." State v. Dennis H., 2002 WI 104, ¶14, 255 Wis. 2d 359, 647 N.W.2d 851. The statute "contains five different definitions or standards of dangerousness for purposes" of an initial commitment. Id.; see also § 51.20(1)(a)2.a.-e. After an initial commitment, a county can seek an extension of a commitment for "a period not to exceed one year." § 51.20(13)(g)1., 3. At a recommitment proceeding, a county may prove current dangerousness under either the five standards of dangerousness under § 51.20(1)(a)2.a.-e. or under those five standards in combination with § 51.20(1)(am). J.W.K., 386 Wis. 2d 672, ¶18; Langlade Cnty. v. D.J.W., 2020 WI 41, ¶50, 391 Wis. 2d 231, 942 N.W.2d 277. Pursuant to § 51.20(1)(am), a county has an alternative avenue for proving dangerousness at an extension proceeding:

> If the individual has been the subject of inpatient treatment for mental illness . . . immediately prior to commencement of the proceedings as a result of . . . a commitment or protective placement ordered by a court under this section . . . the requirements of a recent overt act, attempt or threat to act under par. (a)2.a. or b., pattern of recent acts or omissions under par. (a)2.c. or e., or recent behavior under par. (a)2. d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

11

Wis. Stat. § 51.20(1)(am).

¶19 We later explained that this section works in combination with the five standards of dangerousness, specifically focusing on the standard set forth in Wis. Stat. § 51.20(1)(a)2.d.:

> [W]e focus on whether the introduced testimony meets the standard for dangerousness set by Wis. Stat. § 51.20(1)(a)2.d., as viewed through the lens of § 51.20(1)(am). That is, the testimony must provide sufficient evidence to support the conclusion that D.J.W. would be "unable to satisfy basic needs for nourishment, medical care, shelter or safety without prompt and adequate treatment so that a substantial probability exists that death, serious physical injury, serious physical debilitation, or serious physical disease will imminently ensue[,]" § 51.20(1)(a)2.d., if treatment were withdrawn. § 51.20(1)(am).

D.J.W., 391 Wis. 2d 231, ¶50. Accordingly, Wis. Stat. § 51.20(1)(am) works in combination with the five standards to provide counties with an alternative avenue for proving dangerousness.

¶20 K.E.K. argues that her recommitment is unconstitutional because Wis. Stat. § 51.20(1)(am): (A) violates her right to due process by allowing her to be committed without a showing of current dangerousness; (B) violates her right to equal protection of the law by allowing commitment under circumstances different than those existing under the fifth standard of dangerousness;[12] and (C) is

---

[12] This court discussed the requirements for the fifth standard in Dennis H., stating:

12

unconstitutional as applied to the specific facts of her case. We disagree and uphold the statute against her due process, equal protection, and as-applied challenges.

## A.  Due Process

¶21  K.E.K. argues that Wis. Stat. § 51.20(1)(am) violates her constitutional right to due process.  K.E.K. asserts that § 51.20(1)(am) does not require a showing of current dangerousness because it does not require the government to prove recent acts or omissions.  However, this position misconstrues what § 51.20(1)(am) and due process require. Section 51.20(1)(am) is facially constitutional because it requires a showing of mental illness and current dangerousness, as due process demands.  Accordingly, K.E.K. cannot show that § 51.20(1)(am) "cannot be enforced under any circumstances."

---

The fifth standard permits commitment only when a mentally ill person needs care or treatment to prevent deterioration but is unable to make an informed choice to accept it.  This must be "demonstrated by both the individual's treatment history" and by the person's "recent acts or omissions."  Wis. Stat. § 51.20(1)(a)2.e. [(1999-2000).]  It must also be substantially probable that if left untreated, the person "will suffer severe mental, emotional or physical harm" resulting in the loss of the "ability to function independently in the community" or in the loss of "cognitive or volitional control."  Id.  Only then may the individual be found "dangerous" under the fifth standard.

State v. Dennis H., 2002 WI 104, ¶39, 255 Wis. 2d 359, 647 N.W.2d 851.

13

1. Wisconsin Stat. § 51.20(1)(am) requirements

¶22 Statutory interpretation "begins with the language of the statute." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (internal quotations omitted). If its meaning is plain, then our inquiry ends. Id. We give statutory language "its common, ordinary, and accepted meaning." Id. We give "technical or specially-defined words or phrases" their "technical or special definitional meaning." Id. "Context is important to meaning." Id., ¶46. Accordingly, we interpret statutory language "not in isolation but as part of a whole." Id. For the whole statute to have meaning, we must "give reasonable effect to every word" and "avoid surplusage." Id.

¶23 However, when we have already authoritatively interpreted a statute, we are bound to follow that interpretation unless there is a special justification to depart from our earlier interpretation. See Johnson Controls, 264 Wis. 2d 60, ¶94; Progressive N. Ins. Co., 281 Wis. 2d 300, ¶45. Because we already interpreted Wis. Stat. § 51.20(1)(am) in J.W.K., we must follow our previous interpretation of § 51.20(1)(am).

¶24 As we stated in J.W.K., at a recommitment proceeding, "the County may, as an alternative to the options outlined in § 51.20(1)(a)2.a.-e., prove dangerousness by showing 'a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.'" J.W.K., 386

14

Wis. 2d 672, ¶19. "[P]aragraph (am) functions as an alternative evidentiary path, reflecting a change in circumstances occasioned by an individual's commitment and treatment." Id.

¶25 However, each recommitment, including those where the County utilizes Wis. Stat. § 51.20(1)(am), "requires the County to prove the same elements with the same quantum of proof required for the initial commitment." Id., ¶24. An initial commitment requires a county to prove that the individual is mentally ill, a proper subject for commitment, and currently dangerous. See § 51.20(1); J.W.K., 386 Wis. 2d 672, ¶16. We explained that:

> The dangerousness standard is not more or less onerous during an extension proceeding; the constitutional mandate that the County prove an individual is both mentally ill and dangerous by clear and convincing evidence remains unaltered. Each extension hearing requires proof of current dangerousness. It is not enough that the individual was at one point a proper subject for commitment. The County must prove the individual "is dangerous." The alternate avenue of showing dangerousness under paragraph (am) does not change the elements or quantum of proof required. It merely acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e.

J.W.K., 386 Wis. 2d 672, ¶24 (citations omitted).

¶26 Accordingly, as we authoritatively determined in J.W.K., Wis. Stat. § 51.20(1)(am) merely provides an alternative path for the County to prove current dangerousness——it does not change the requirement that the County prove, by clear and convincing evidence, that the individual is mentally ill, a

15

proper subject for treatment, and currently dangerous. Id. We reaffirm that determination.

### 2. Due process and commitment proceedings

¶27 The Constitution forbids the government from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. V (applying the prohibition to the federal government); amend. XIV, § 1 (applying the same to the States). "[C]ommitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." J.W.K., 386 Wis. 2d 672, ¶16. As we stated last term, "in a civil commitment case, due process requires the [government] to prove by clear and convincing evidence that the individual is both mentally ill and dangerous." Marathon Cnty. v. D.K., 2020 WI 8, ¶29, 390 Wis. 2d 50, 937 N.W.2d 901.

¶28 The United States Supreme Court established that, before the government can commit someone and deprive that person of liberty, "the [government] must prove by clear and convincing evidence that [the individual] is demonstrably dangerous to the community." Foucha v. Louisiana, 504 U.S. 71, 81 (1992). K.E.K. asserts that this means the County must use recent acts or omissions to prove she is "demonstrably dangerous." However, no such requirement appears in Foucha, nor has the Court ever required a specific type of evidence to prove current dangerousness. Indeed, "[i]n this complicated and difficult area, the Supreme Court 'has wisely left the job of creating statutory definitions to the legislators who draft state laws.'"

16

Dennis H., 255 Wis. 2d 359, ¶38 (quoting State v. Post, 197 Wis. 2d 279, 304, 541 N.W.2d 115 (1995)). As such, we decline to create, from whole-cloth, a constitutional requirement that a county use recent acts or omissions at a commitment extension proceeding. Instead, we rely on the options the legislature provided to the counties to prove current dangerousness——the five standards from Wis. Stat. § 51.20(1)(a)2.a.-e. and the alternative evidentiary path from § 51.20(1)(am). It is the definitions and requirements the legislature chose that must comport with due process, not the novel requirement that K.E.K. proposes.

3. Wisconsin Stat. § 51.20(1)(am) satisfies due process.

¶29 To satisfy due process, the government must prove that the individual is both mentally ill and currently dangerous by clear and convincing evidence. See Foucha, 504 U.S. at 81. We have held that, at a recommitment proceeding, a county must meet this due process standard. J.W.K., 386 Wis. 2d 672, ¶24. Thus, to succeed on a due process claim here, K.E.K. must prove that Wis. Stat. § 51.20(1)(am) does not require a showing of current dangerousness. K.E.K. cannot do so because, as this court unanimously recognized, § 51.20(1)(am) creates an alternative

evidentiary path to prove <u>current</u> dangerousness.  See <u>J.W.K.</u>, 386 Wis. 2d 672, ¶¶24, 34.[13]

¶30  Therefore, because Wis. Stat. § 51.20(1)(am) requires proof of current dangerousness, it satisfies the Due Process Clause's requirements.  Accordingly, K.E.K. cannot show that § 51.20(1)(am) violates Due Process in all applications, so her facial challenge fails.

### B.  Equal Protection

¶31  K.E.K. also alleges that Wis. Stat. § 51.20(1)(am) violates her constitutional right to equal protection of the laws by allowing for commitment under different standards than a commitment under the fifth standard, § 51.20(1)(a)2.e.  However, the state[14] has a rational basis for allowing these different evidentiary standards.  Accordingly, K.E.K.'s facial equal protection claim fails.

¶32  K.E.K. claims that those recommitted under Wis. Stat. § 51.20(1)(am) and those committed under the fifth standard are similarly situated, but that a county may commit someone under

---

[13] The majority opinion in <u>J.W.K.</u> stated that "[e]ach extension hearing requires proof of <u>current</u> dangerousness . . . . The County must prove the individual '<u>is</u> dangerous.'  The alternate avenue of <u>showing</u> dangerousness under paragraph (am) does not change the elements or quantum of proof required."  <u>J.W.K.</u>, 386 Wis. 2d 672, ¶24 (citations omitted). Similarly, the dissent described Wis. Stat. § 51.20(1)(am) as "creating an alternative path to prove current dangerousness . . . ."  <u>Id.</u>, ¶35 (Dallet, J., dissenting).

[14] Although it is the counties who file petitions under Wis. Stat. § 51.20, the state created the commitment scheme via statute.  Accordingly, the state must possess a rational basis for any differential treatment, not the counties.

18

§ 51.20(1)(am) without proving the elements that we held are necessary for a commitment under the fifth standard.[15]   K.E.K. argues that the state does not have a rational basis for requiring these elements for an initial commitment under the fifth standard and a recommitment under § 51.20(1)(am).   Thus, she asserts, § 51.20(1)(am) violates her right to equal protection of the laws.

¶33   "To prove an equal protection clause violation, the party challenging a statute's constitutionality must show that 'the state unconstitutionally treats members of similarly situated classes differently.'"   State v. West, 2011 WI 83, ¶90, 336 Wis. 2d 578, 800 N.W.2d 929 (quoting Post, 197 Wis. 2d at 318).   However, "[t]he right to equal protection does not require that such similarly situated classes be treated identically, but rather requires that the distinction made in treatment have some relevance to the purpose for which

---

[15] We described these necessary elements for a commitment under the fifth standard in Dennis H.:

> The fifth standard permits commitment only when a mentally ill person needs care or treatment to prevent deterioration but is unable to make an informed choice to accept it.   This must be "demonstrated by both the individual's treatment history" and by the person's "recent acts or omissions."   It must also be substantially probable that if left untreated, the person "will suffer severe mental, emotional or physical harm" resulting in the loss of the "ability to function independently in the community" or in the loss of "cognitive or volitional control."

Dennis H., 255 Wis. 2d 359, ¶39 (citation omitted).

19

classification of the classes is made." Id. Thus, the first step in an equal protection claim is to identify similarly situated, yet differently treated individuals. See Dennis H., 255 Wis. 2d 359, ¶31; Post, 197 Wis. 2d at 318-19. The second step is to determine if the government has an appropriate basis for the different classifications and treatment. See Dennis H., 255 Wis. 2d 359, ¶31.

¶34 Those committed under Wis. Stat. § 51.20(1)(am) and those committed under the fifth standard are similarly situated. A county, under either § 51.20(1)(am) or the fifth standard, must prove exactly the same underlying elements with the same quantum of proof required for commitment. See J.W.K., 386 Wis. 2d 672, ¶24 ("The alternate avenue of showing dangerousness under paragraph (am) does not change the elements or quantum of proof required. It merely acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e."). Moreover, when a county uses § 51.20(1)(am), it does so in combination with the five standards, including when a county commits someone under the fifth standard through the lens of § 51.20(1)(am). See D.J.W., 391 Wis. 2d 231, ¶50. That is, the two statutes work in concert with each other, so those committed under either section face nearly identical elements and restraints. Accordingly, a person facing a commitment under the fifth standard and a person facing an extension of a commitment under § 51.20(1)(am) are similarly situated. Cf. Post, 197 Wis. 2d at 318-19 (holding that

20

"persons committed under chapters 51 and 980 are similarly situated for purposes of an equal protection comparison").

¶35 Because those committed under Wis. Stat. § 51.20(1)(am) and those committed under the fifth standard are similarly situated, we must evaluate whether the "statutorily distinctive mechanisms for dealing with the two classes was proper in light of the difference between the classifications." West, 336 Wis. 2d 578, ¶92.  "Whether a legislative distinction between otherwise similarly situated persons violates equal protection depends upon whether there is a reasonable basis to support it."  Dennis H., 255 Wis. 2d 359, ¶31.  "Where the classification does not involve a suspect class, equal protection is denied only if the legislature has made an irrational or arbitrary classification."  Id. (quoting State ex rel. Jones v. Gerhardstein, 141 Wis. 2d 710, 733, 416 N.W.2d 883 (1987)).  Describing the power of the state to create different classifications, we have stated:

> "[T]he state retains broad discretion to create classifications so long as the classifications have a reasonable basis."  Under the rational basis test, a statutory classification is presumed to be proper.  It will be sustained if the reviewing court can identify any reasonable basis to support it.  Any doubt must be resolved in favor of the reasonableness of the classification and the constitutionality of the statute in which it is made.  A "legislative enactment must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest."

Dennis H., 255 Wis. 2d 359, ¶32 (citations omitted). Accordingly, we apply a rational basis level of scrutiny to Wis.

21

Stat. § 51.20(1)(am) and will sustain it if we can identify "any reasonable basis to support" the different classifications.

¶36 We determine that the state has a reasonable basis for treating those committed under the fifth standard and those committed under Wis. Stat. § 51.20(1)(am) differently. The purpose of § 51.20(1)(am) "is to allow extension of a commitment when the patient's condition has not improved enough to warrant discharge. Because of the therapy received, evidence of recent action exhibiting 'dangerousness' is often nonexistent. Therefore, the emphasis is on the attendant consequence to the patient should treatment be discontinued." M.J. v. Milwaukee Cnty. Combined Cmty. Servs. Bd., 122 Wis. 2d 525, 530-31, 362 N.W.2d 190 (Ct. App. 1984); see also J.W.K., 386 Wis. 2d 672, ¶23. Thus, unlike the fifth standard, § 51.20(1)(am) applies only to patients that are already receiving treatment. By enacting this alternative means of showing dangerousness, the legislature conceivably could have wanted——and likely did want—— to give counties a more realistic basis by which to prove current dangerousness when it is likely the committed individual would discontinue treatment if no longer committed. See J.W.K., 386 Wis. 2d 672, ¶24 ("[Wisconsin Stat. § 51.20(1)(am)] merely acknowledges that an individual may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness outlined in § 51.20(1)(a)2.a.-e."). As the court of appeals previously explained:

> The clear intent of the legislature in amending [Wis. Stat. § 51.20(1)(am)] was to avoid the "revolving door" phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted. The result was a vicious circle of treatment, release, overt act, recommitment. The legislature recognized the danger to the patients and others of not only allowing for, but requiring, overt acts as a prerequisite for further treatment.

State v. W.R.B., 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987). Accordingly, we hold that addressing the "revolving door" phenomena is a reasonable basis for the different evidentiary avenues of § 51.20(1)(am) and the fifth standard.

¶37 Accordingly, K.E.K. is unable to prove that the state impermissibly treats those committed under Wis. Stat. § 51.20(1)(am) and those committed under the fifth standard differently. Therefore, the statute does not violate K.E.K.'s right to equal protection of the laws.

## C. As Applied

¶38 K.E.K. also challenges Wis. Stat. § 51.20(1)(am)'s constitutionality as applied to her. She claims that, based on the specifics of her case, § 51.20(1)(am) violates due process, the Privileges or Immunities Clause, and the Equal Protection Clause. She argues that, because she was not dangerous to herself or others, "§ 51.20(1)(am) plainly, clearly, and beyond a reasonable doubt violates the 14th Amendment as applied to the facts of [her] case." This argument, however, advances an evidentiary sufficiency challenge under the guise of as-applied constitutional challenges. Accordingly, K.E.K.'s as-applied

23

constitutional challenges to § 51.20(1)(am) fail because they are sufficiency of the evidence challenges, not constitutional challenges.

¶39 A claim that a statute is unconstitutional as applied is "a claim that a statute is unconstitutional on the facts of a particular case or to a particular party." Voters with Facts v. City of Eau Claire, 2018 WI 63, ¶60, 382 Wis. 2d 1, 913 N.W.2d 131 (quoting Olson v. Town of Cottage Grove, 2008 WI 51, ¶44 n.9, 309 Wis. 2d 365, 749 N.W.2d 211). Although these claims operate on the basis of the "facts of a particular case," it does not transform the as-applied constitutional challenge into an alternative means to attack the sufficiency of the evidence.

¶40 K.E.K. asserts that "[i]t is undisputed that [she] posed no danger to herself or others during her commitment." This is not a challenge to the constitutionality of the statute as applied to K.E.K.'s facts; it challenges the application of the statute to the facts of this case. The statute has no application, constitutional or otherwise, against those who are not currently dangerous. See, e.g., D.J.W., 391 Wis. 2d 231, ¶59 (concluding the evidence was insufficient at a recommitment hearing to prove dangerousness under Wis. Stat. § 51.20(1)(am)). If K.E.K. is not currently dangerous, the County has no power to commit her under the statute. If the evidence is insufficient, it does not mean the statute is unconstitutional——it merely means that the County violated the statute.

24

¶41 Accordingly, K.E.K.'s as-applied constitutional challenges fail. Her dispute is with the sufficiency of the evidence, not with the constitutionality of Wis. Stat. § 51.20(1)(am).

## IV. CONCLUSION

¶42 We conclude that K.E.K. is unable to prove that Wis. Stat. § 51.20(1)(am) cannot be enforced under any circumstances because due process and the statute both require a showing of mental illness and current dangerousness. As such, K.E.K.'s facial due process challenge fails.

¶43 Moreover, Wis. Stat. § 51.20(1)(am) creates an alternative path to give counties a more realistic basis by which to prove current dangerousness when it is likely the committed individual would discontinue treatment if no longer committed. Thus, the state has a rational basis for treating those recommitted under § 51.20(1)(am) and those committed under § 51.20(1)(a)2.e. differently.

¶44 Finally, K.E.K.'s as-applied constitutional challenges are disguised sufficiency of the evidence challenges. Her argument is that she does not meet the statutory standard for dangerousness, not that Wis. Stat. § 51.20(1)(am) is unconstitutional when applied to K.E.K.'s specific facts.

¶45 Therefore, we conclude that Wis. Stat. § 51.20(1)(am) is facially constitutional and that K.E.K.'s as-applied constitutional challenges fail. Accordingly, we affirm the decision of the court of appeals.

25

*By the Court.*—The decision of the court of appeals is affirmed.

¶46 REBECCA FRANK DALLET, J. (*dissenting*). The Fourteenth Amendment to the United States Constitution prohibits the government from involuntarily confining a person with a mental illness unless it can prove that person is currently dangerous. K.E.K. argues that Wis. Stat. § 51.20(1)(am) (2017-18)[1] is unconstitutional because it allows the government to extend her commitment based not on her recent acts or omissions but on a treatment record detailing past behaviors and on predictions that, if no longer committed, she might behave dangerously in the future. In the face of that constitutional challenge, the majority fails to engage in any real analysis of whether this type of "alternative" evidence passes constitutional muster. It does not. Section 51.20(1)(am) is facially unconstitutional because it eliminates the constitutionally required showing of current dangerousness in favor of "alternative" evidence that shows only that a person was or might become dangerous. Therefore, I respectfully dissent.

---

[1] K.E.K.'s challenge implicates only the first of the three sentences in Wis. Stat. § 51.20(1)(am). If successful, her challenge would void only that sentence because the other two are distinct, separable, and not dependent on the first. See State v. Hezzie R., 219 Wis. 2d 848, 863, 580 N.W.2d 660 (1998) ("[P]art of a statute may be unconstitutional, and the remainder may still have effect, provided the two parts are distinct and separable and are not dependent upon each other." (quoting Muench v. PSC, 261 Wis. 492, 515, 55 N.W.2d 40 (1952))). Therefore, when I refer to § 51.20(1)(am), I refer only to its first sentence.

I

¶47 The civil commitment of persons diagnosed with a mental illness constitutes a government exercise of either its parens patriae power to care for citizens unable to care for themselves or its police power to prevent harm to the community. See Addington v. Texas, 441 U.S. 418, 426 (1979). While both are legitimate government interests, neither is boundless. Involuntary mental health commitments are, after all, "a significant deprivation of liberty." Id.; Vitek v. Jones, 445 U.S. 480, 491–92 (1980). They deprive persons of their most basic and fundamental freedom "to go unimpeded about [their] affairs" and to make decisions regarding their health. Lessard v. Schmidt, 349 F. Supp. 1078, 1084 (E.D. Wis. 1972), vacated and remanded on other grounds, 421 U.S. 957 (1975), reinstated, 413 F. Supp. 1318 (E.D. Wis. 1976).

¶48 The Fourteenth Amendment to the United States Constitution guarantees that no citizen may be involuntarily committed without due process. See Vitek, 445 U.S. at 491–92 ("[C]ommitment . . . produces 'a massive curtailment of liberty,' and in consequence 'requires due process protection.'" (quoted sources omitted)). Thus, an individual facing commitment must have a meaningful opportunity to contest the evidence against her. State v. Hanson, 98 Wis. 2d 80, 86, 295 N.W.2d 209 (Ct. App. 1980), aff'd, 100 Wis. 2d 549, 302 N.W.2d 452 (1981). And because an involuntary mental health commitment is premised on either an individual's inability to care for herself or her danger to the public, due process

2

dictates that the government must demonstrate, by clear and convincing evidence, that the person is both mentally ill and dangerous to herself or others.[2]  Marathon Cnty. v. D.K., 2020 WI 8, ¶¶27-28, 390 Wis. 2d 50, 937 N.W.2d 901 (citing O'Connor v. Donaldson, 422 U.S. 563, 576 (1975) and Addington, 441 U.S. at 432-33).  As we recently held, the government must prove that an individual is "current[ly] dangerousness"; "it is not enough that the individual was" dangerous.  Portage Cnty. v. J.W.K., 2019 WI 54, ¶24, 386 Wis. 2d 672, 927 N.W.2d 509.

---

[2] There is no dispute that the Fourteenth Amendment substantively protects the basic liberty of non-dangerous individuals against the government's attempts to deprive them of that liberty.  See O'Connor v. Donaldson, 422 U.S. 563, 575-76 (1975); Vitek v. Jones, 445 U.S. 480, 491-92 (1980).  There is some debate, however, about whether it is the Fourteenth Amendment's Due Process Clause or its Privileges or Immunities Clause that prevents states from infringing on an individual's inherent right to liberty.  See, e.g., Planned Parenthood of Se. Penn. v. Casey, 505 U.S. 833, 847-48 (1992) (explaining that the Due Process Clause protects "a realm of personal liberty which the government may not enter"); Winnebago Cnty. v. C.S., 2020 WI 33, ¶¶47-70, 391 Wis. 2d 35, 940 N.W.2d 875 (Rebecca Grassl Bradley, J., dissenting) (concluding that "liberty interests may be vindicated under the Privileges or Immunities Clause"); Josh Blackman & Ilya Shapiro, Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States, 8 Geo. J.L. & Pub. Pol'y 1, 64 (2010) ("The Privileges or Immunities Clause is about individual liberty.").  This academic debate has no bearing on K.E.K.'s challenge.  After all, this court has already held that, based on the United States Supreme Court's "due process" jurisprudence, the government must prove current dangerousness.  See Marathon Cnty. v. D.K., 2020 WI 8, ¶¶26-27, 390 Wis. 2d 50, 937 N.W.2d 901 (citing O'Connor, 422 U.S. at 576).  Support for this basic liberty may also be found in the Wisconsin Constitution's protection of the people's "inherent right[]" to "liberty."  Wis. Const. art. I, § 1.

3

¶49 These constitutional due process protections, however, have not always been the law in Wisconsin, and vestiges of our troubling history in this area remain. In the early 1970s, Wisconsin became the epicenter of civil commitment reform following a class-action lawsuit that contested Wisconsin's mental health commitment procedures. See Lessard, 349 F. Supp. 1078. There, a three-judge federal panel enjoined Wisconsin's commitment laws because Alberta Lessard, like many committed before her, was denied a series of key procedural protections:

- adequate notice of the proceedings against her;
- a prompt probable-cause hearing, despite being detained;
- the ability to invoke her right against self-incrimination or object to hearsay evidence;
- a heightened burden of proof commensurate with the deprivation of her liberty; and
- her right to counsel.

Id. at 1090-1103. Lessard's victory led to certain procedural changes, but our pre-Lessard ghosts continue to haunt us. Indeed, as of 2015, Wisconsin involuntarily commits its citizens diagnosed with mental illnesses at a higher rate than any other state.[3] Although we presume that the State's current mental

---

[3] Wisconsin involuntarily commits roughly 44 of every 1,000 persons diagnosed with a serious mental health disorder, far exceeding the average rate of other states (9 per 1,000). Substance Abuse & Mental Health Servs. Admin., Civil Commitment and the Mental Health Care Continuum: Historical Trends and Principles for Law and Practice 12 (2019).

4

health commitment scheme is constitutional, we cannot ignore its history to the contrary. See Winnebago Cnty. v. C.S., 2020 WI 33, ¶14, 391 Wis. 2d 35, 940 N.W.2d 875.

¶50 Today, mental health commitments begin with a six-month initial commitment once the criteria set forth in Wis. Stat. § 51.20(1)(a) are met. See § 51.20(13)(g)1. (limiting the initial commitment period to not more than six months). As discussed above, the government must show that the person is both mentally ill and currently dangerous. § 51.20(1)(a); D.K., 390 Wis. 2d 50, ¶27. The government may prove the latter requirement if it can show, by clear and convincing evidence, that there is a substantial probability that, based on recent acts or omissions, the person will cause physical harm to herself or others in at least one of four ways. § 51.20(1)(a)2.a.-d. A fifth standard allows the government to prove current dangerousness by showing a substantial probability that, without treatment, an individual who has demonstrated an "inability to make informed treatment decisions" will "further decompensat[e]" to the extent that she cannot independently care for herself, "as demonstrated by both the individual's treatment history and his or her recent acts or omissions." § 51.20(1)(a)2.e.; State v. Dennis H., 2002 WI 104, ¶¶20-24, 255 Wis. 2d 359, 647 N.W.2d 851.

¶51 After the initial six-month commitment period, the government may extend the commitment for up to one year at a time. See § 51.20(13)(g)1. & 3. At each extension hearing, the government must again demonstrate both mental illness and

5

current dangerousness. § 51.20(13)(g)3.; J.W.K., 386 Wis. 2d 672, ¶21. The evidence of current dangerousness must be "independent[]" of that introduced at the initial commitment proceeding. J.W.K., 386 Wis. 2d 672, ¶¶21, 24. Just as in the initial commitment proceedings, § 51.20(1)(a)2. governs the type of evidence the government can use to show current dangerousness.

¶52 But § 51.20(1)(am) provides an "alternative" evidentiary path. Under that provision, the government may "satisf[y]" the respective recent-act-or-omission requirements in each of the five dangerousness standards "by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." (Emphases added.) Thus, by its plain language, § 51.20(1)(am) permits the government to extend an individual's commitment based not upon evidence that an individual is dangerous but upon a prediction that she might become dangerous in one of the ways defined in § 51.20(1)(a)2.

¶53 That is the route Waupaca County took here. The circuit court extended K.E.K's commitment under the fifth standard of dangerousness, § 51.20(1)(a)2.e., by way of the § 51.20(1)(am) "alternative," basing its order on the predictions of two mental health professionals. Those witnesses forecasted that K.E.K., based on her treatment record, would become a proper subject for commitment under the fifth standard if treatment were withdrawn.

6

¶54 K.E.K. argues that extending her commitment based on this "alternative" to evidence of recent acts or omissions contravenes her Fourteenth Amendment rights in that it allows the government to extend her commitment without providing any evidence that she is currently dangerous. In rejecting her challenge, the majority opinion sidesteps the constitutional question, instead misinterpreting and improperly relying on J.W.K. A careful constitutional analysis of § 51.20(1)(am), however, reveals that it is facially unconstitutional.

II

¶55 The majority opinion errs in its premise that we "authoritatively determined" in J.W.K. that Wis. Stat. § 51.20(1)(am) is constitutional. See majority op., ¶26. There, however, we interpreted the language of § 51.20(1)(am) only to determine whether J.W.K.'s appeal challenging the sufficiency of the evidence was moot. We made no pronouncement either way about its constitutionality——an unsurprising result given that J.W.K. did not raise a constitutional challenge.

¶56 To the extent that J.W.K. addresses current dangerousness, its reasoning undercuts the majority's conclusion rather than supports it. The majority claims that § 51.20(1)(am) is constitutional because, per J.W.K., it allows the government to use "alternative" evidence to show that an individual "may still be dangerous despite the absence of recent acts, omissions, or behaviors exhibiting dangerousness." Id., ¶36 (quoting J.W.K., 386 Wis. 2d 672, ¶24). That is, the majority opinion accepts as "current" the dangerous behavior

7

that led to the individual's initial commitment, based on conjecture that this same behavior might manifest itself again if treatment is withdrawn. But J.W.K. rejected that very argument, explaining that the government may not extend an individual's commitment by resting solely on the evidence used to initially commit her. J.W.K., 386 Wis. 2d 672, ¶24 ("It is not enough that the individual was at one point a proper subject for commitment."). Simply put, J.W.K. provides no basis for a constitutional analysis of § 51.20(1)(am); it instead bolsters K.E.K.'s position that whatever evidence of dangerousness supported her initial commitment cannot satisfy the constitutional requirement that the government demonstrate she is dangerous right now. The majority opinion's mistaken reliance on and misinterpretation of J.W.K. stunts any actual constitutional analysis of § 51.20(1)(am).

¶57 A proper examination of the plain language of § 51.20(1)(am) reveals that it is facially unconstitutional because it allows the government to involuntarily commit someone who is not currently dangerous. Section 51.20(1)(am) substitutes the recent-act-or-omission requirements of § 51.20(1)(a)2. with a showing that there is a "substantial likelihood," based on the subject individual's treatment record, that the individual "would be a proper subject for commitment if treatment were withdrawn." (Emphases added.) The use of "would be" in tandem with an "if" clause forms a "future unreal conditional." As the label implies, such sentences deal with hypothetical futures based on some condition not currently

8

present. This phrasing redefines "is dangerous" to mean "<u>might</u> be dangerous <u>if</u> some <u>future</u> conditions are met."

¶58 The problem with relying on the future conditional language in § 51.20(1)(am) is compounded by the fact that the five standards of dangerousness are already predictions about future behavior. Each standard is based on a "substantial probability" that harm will occur. What saves the five standards from being unconstitutional in the initial commitment context is that each requires evidence of a recent act or omission that evinces dangerousness. <u>See</u> § 51.20(1)(a)2. Section 51.20(a)(am) dispenses entirely with that recent-act-or-omission requirement, allowing it to be "satisfied" with future speculation, thus layering uncertainty on top of uncertainty while never proving that an individual is in fact dangerous right now.

¶59 Section 51.20(1)(am)'s reliance on an individual's treatment record likewise does not establish proof of current dangerousness. An individual's treatment record will always include some past event of dangerous behavior; otherwise the individual could not have been committed in the first place. But in the commitment extension context, if the government's only evidence of dangerousness is that which led to the initial commitment, then it has no evidence of current dangerousness. <u>See</u> <u>J.W.K.</u>, 386 Wis. 2d 672, ¶24. And without evidence of current dangerousness, an individual cannot be involuntarily committed. <u>J.W.K.</u>, 386 Wis. 2d 672, ¶21; <u>Foucha v. Louisiana</u>, 504 U.S. 71, 77-78 (1992).

9

¶60 K.E.K.'s commitment extension illustrates just how divorced predictions about future dangerousness are from current dangerousness. Both the County's psychiatrist, Dr. Marshall Bales, and K.E.K.'s behavioral health case manager, Heather Van Kooy, confirmed that K.E.K was stable in an outpatient facility. They explained that K.E.K. was responding to treatment, that she had been taking her medication, and that she had committed no recent violent or threatening acts. Dr. Bales pointedly stated that K.E.K. had "not been dangerous over the last number of months." Although he noted that K.E.K. lacked insight into her mental illness and that she still talked and giggled to herself, he acknowledged that those symptoms are not necessarily dangerous behaviors. Ms. Van Kooy agreed that K.E.K.'s symptoms had not manifested in any dangerous behaviors or threats of harm to herself or others. Far from showing that K.E.K. was currently dangerous, Dr. Bales's and Ms. Van Kooy's testimony exemplify the disconnect between predictions about future dangerousness permitted under § 51.20(1)(am) and actual evidence of current dangerousness required by the Constitution and our precedent.

B

¶61 Failing to grapple with that disconnect, the majority opinion offers two last-ditch, but unavailing, arguments for upholding Wis. Stat. § 51.20(1)(am). First, it upholds § 51.20(1)(am) on the grounds that it "give[s] counties a more realistic basis by which to prove dangerousness." Majority op., ¶36. More realistic than what is unclear.

10

Notwithstanding, there is nothing unrealistic about a standard of proof that requires evidence of current dangerous behavior to show that someone is currently dangerous. If the government has no such evidence, perhaps the committed individual is, in fact, not currently dangerous.

¶62 To that, the majority opinion responds with its second defense of § 51.20(1)(am): the "revolving door" phenomena. This justification posits that without the "alternative" evidence permitted under § 51.20(1)(am), committed individuals will enter a "vicious circle of treatment, release, overt act, recommitment." Majority op., ¶36 (quoting State v. W.R.B., 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987)). Setting aside the fact that this judicially crafted rationale lacks any basis in the text or legislative history of § 51.20(1)(am), it does nothing to address the fact that § 51.20(1)(am) impermissibly redefines "currently dangerous." Instead, it assumes the truth of the constitutional violation——that the individual is not presently dangerous——while excusing that violation because the previously committed individual may meet the commitment requirements again.

¶63 I understand, to a point, the policy concerns underlying this revolving door reality for some. I recognize that an individual released from a mental health commitment may at some point cease treatment and again become a proper subject for commitment. I also recognize that simply extending an individual's commitment may be more expedient than having to

11

start the commitment process anew should an individual's condition significantly deteriorate.

¶64 The Constitution, however, yields to neither good intentions nor expediency. Its protections are all the more important when faced with well-intentioned and efficient practices that ultimately amount to a violation of an individual's fundamental liberty. See Bonnett v. Vallier, 136 Wis. 193, 200, 116 N.W. 885 (1908) ("Good intentions in the passage of a law or a praiseworthy end sought to be attained thereby cannot save the enactment if it transcends in the judgment of the court the limitations which the Constitution has placed upon legislative power."); Kiley v. Chi., Milwaukee & St. Paul Ry. Co., 138 Wis. 215, 256, 119 N.W. 309 (1909) ("The Constitution was made to guard the people against the dangers of good intentions as well as bad intentions and mistakes. The former may excuse a void enactment, but never justify it."). Therefore, as concerning as the revolving door phenomenon may be, it cannot justify depriving individuals of their liberty without due process.

III

¶65 The government may constitutionally commit someone against her will only if she is mentally ill and currently dangerous. By its plain terms, Wis. Stat. § 51.20(1)(am) swaps the latter requirement for evidence of an individual's past conduct and uncertain predictions about her potential future dangerousness. Under no set of facts, however, can past records or speculative predictions, on their own, demonstrate current

12

dangerousness. Accordingly, I conclude that § 51.20(1)(am) facially violates the Fourteenth Amendment to the United States Constitution.

¶66 I therefore respectfully dissent.

¶67 I am authorized to state that Justice JILL J. KAROFSKY joins this dissent.