**COURT OF APPEALS
DECISION
DATED AND FILED**

**July 19, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP254**

**STATE OF WISCONSIN**

Cir. Ct. No. 2022ME214

**IN COURT OF APPEALS
DISTRICT II**

IN THE MATTER OF THE MENTAL COMMITMENT OF P.J.L.:

RACINE COUNTY,

PETITIONER-RESPONDENT,

V.

P.J.L.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Kenosha County: DAVID P. WILK, Judge. *Affirmed*.

¶1    NEUBAUER, J.[1]  P.J.L., referred to herein by the pseudonym Paul, appeals from orders involuntarily committing him to a locked inpatient facility for six months and ordering the involuntary administration of medication during that time.  Paul argues that Racine County (the County) did not meet its burden under WIS. STAT. § 51.20 of proving that he is dangerous by clear and convincing evidence.  For the reasons that follow, this court concludes that the County met its burden and thus affirms the orders.

## BACKGROUND

¶2    Mount Pleasant police emergently detained Paul on August 2, 2022, after being dispatched to his residence and observing him with "blood all over his face, arms, legs and feet" and "severe cuts above both ears and one in the back of his head," possibly from trying to cut his hair with a hand razor.  The responding officer reported that Paul "was non-verbal and only expressed he did not want medical treatment or to talk to us" and that Paul's mother reported that he had "stated he wanted to take over the world."  Paul was transported to a local hospital.  On the way, he was reported to be "not verbal and had numerous pre attack postures and violent tendency signs showing."  At the hospital, Paul "remained mainly non-verbal and urinated over the bed and floor."

¶3    Another officer who helped transport Paul from the hospital to the Winnebago Mental Health Institute (WMHI) reported that Paul "started shouting at officers and displayed a boxer stance, demanding officers to tase him" while at the hospital and "began aggressive behavior again and demanded to be tased"

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

upon reaching WMHI.  Paul was also reported to have urinated on the floor at WMHI while saying, "this is my fucking hospital, I'm marking my territory."

¶4      On August 5, 2022, the circuit court for Racine County found probable cause to believe that Paul was mentally ill, a proper candidate for treatment, and dangerous to himself or others.[2]  The court continued Paul's detention pending a final hearing, ordered involuntary medication, and transferred the case to the circuit court for Kenosha County, the county in which Paul lived. That court appointed two psychiatrists, Dr. Marshall Bales and Dr. Sangita Patel, to examine Paul and prepare reports that were filed with the court.

¶5      In his report, Dr. Bales wrote that he had reviewed records from WMHI, documents related to Paul's emergency detention, including the police report, and had spoken with WMHI staff members but not Paul, who had declined to participate.  The report summarized the events that occurred shortly after Paul's mother bailed him out of jail and led to his initial detention:

> However, after being at her home for only a day, she quickly noted he was psychiatrically unstable.  He had cuts on the back of his head from attempting to cut his own hair. He also had self-inflicted cuts on his body possibly related to his long-standing delusion of worm infestation or parasites that he believed were in him.  He spoke of wanting to conquer the world.  He was threatening once. He attempted to cook something with bizarre ingredients and started a small kitchen fire, which the family was able to put out.  He had three police contacts in a short time.  He was threatening with police and had "numerous preattack postures."

---

[2]  The Honorable Wynne P. Laufenberg made the probable cause determination.

¶6    Since being admitted to WMHI, Bales wrote, "[Paul] has been threatening and scaring other patients.  He will urinate on the floor in front of everyone, claiming he is marking his territory.  He threatened a peer.  He has been agitated at times and isolative at other times.   He has repeatedly been uncooperative with examiners."  Bales also wrote that Paul "has not clearly been suicidal" but that "his self-injurious cutting behavior and setting a kitchen fire are obviously dangerous.  He has repeatedly been threatening to others in this manic and psychotic state."

¶7    Based upon his brief interaction with Paul and the other information he reviewed, Bales opined that Paul suffered from schizoaffective disorder with mania and psychotic features and was a proper candidate for treatment.  Bales also opined that Paul was dangerous under the second standard in WIS. STAT. § 51.20(1)(a)2.b. because he posed "[a] substantial probability of physical harm to other subjects" and under the third standard in § 51.20(1)(a)2.c. because Paul showed "[s]uch impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to [himself] or other individuals."

¶8    On August 15, 2022, the circuit court held a final hearing.[3]  The County called Bales as its only witness and introduced his report into evidence.  Bales testified that he was present when police initially brought Paul in and "definitely feared for [his] safety" at that time because Paul "pulled open his trousers and he yelled and screamed and then urinated a large amount of urine on

_____

[3] The Honorable David W. Wilk presided at the final hearing and entered the orders from which Paul appeals.

4

the floor." Bales described Paul as appearing "very angry" and testified that he noticed "clumps" of Paul's hair missing and "a whole bunch of dried blood around his head."

¶9 Based on his own observations and reports from another doctor that Paul had been "psychotic," "manic," "delusional," and "agitated," Bales testified that Paul suffers from schizoaffective disorder, which he agreed was "a substantial disorder of mood, thought, or perception." He agreed that Paul's disorder is "a condition that impairs judgment, behavior, capacity to recognize reality, or ability to meet ordinary demands of life," explaining that Paul accidentally starting the kitchen fire and cutting himself because of a "delusion that there w[ere] worms or bugs in his head" were "related to [the fact] that he was psychotic."

¶10 As to dangerousness, Bales testified that Paul's "cutting himself to where he had all this blood and bleeding" met the third standard set forth in WIS. STAT. § 51.20(1)(a)2.c. Bales did not testify, as he had indicated in his report, that Paul was dangerous under the second standard in § 51.20(1)(a)2.b. Finally, Bales confirmed that Paul was a proper subject for treatment and was substantially likely to become a proper subject for treatment if the treatment he was receiving was withdrawn. When asked for the basis for this opinion, Bales said that when Paul was released from jail, his mother "took him home and he was—it was—excuse the word—it was a disaster. She did the best she could, but he's either dangerous or in danger." Bales recommended that Paul remain confined in an inpatient, locked unit and that he be medicated involuntarily because he had previously failed to take medication voluntarily.

¶11 On cross-examination, Bales acknowledged that Paul spent five or six months in solitary confinement at the Kenosha jail before he was emergently

detained, a setting that Bales said "can exacerbate or flare an untreated underlying mental illness." Bales also agreed that Paul's mental state had improved since he had started receiving medication and that he might be able to be transitioned to an outpatient setting within "[a] week or two." In addition, Bales confirmed that Paul was not a risk for suicide and had not, to Bales's knowledge, "expressed any threats of harm to any other individual other than himself," though "he did cause other patients to fear him as [Bales] did."

¶12     Paul also testified at the hearing. He said the isolated conditions in which he was kept for six months at the jail "[d]eteriorated" his mental health and led him to stop taking medication. He also testified that the toilet in his cell did not always work, which forced him to "urinate outside [of his] cell" and defecate on his food tray after meals. He explained that he cut his hair after being released from jail using a dull knife or razor but that he did not feel suicidal or homicidal at that time. He stated he was receiving "five meals a day" at WMHI, had sufficient access to a toilet, and was taking medication via pill rather than long-lasting injection "because I know that I'm here on a day-by-day basis until I was able to reach a courtroom."

¶13     Based upon the evidence presented at the hearing and "the contents of the court file," the circuit court concluded that Paul met the three requirements for involuntary commitment under WIS. STAT. § 51.20. First, the court determined that Paul was mentally ill based on Bales's diagnosis of schizoaffective disorder, which "results in psychotic manic and delusional thought processes." Next, the court determined that Paul was a proper subject for treatment, relying on Bales's testimony that Paul's condition was treatable.

¶14 Finally, as to the requirement of dangerousness, the circuit court referred to the second standard set forth in WIS. STAT. § 51.20(1)(a)2.b., under which a person is deemed dangerous if he

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

The court determined that the County had established dangerousness under this standard. The court began by referring to Bales's observation that Paul "was agitated, he was exhibiting violent behavior, he urinated on the floor, he had cut out clumps of his own hair, [and] had dried blood" on his head when he first arrived at WMHI, and Bales's testimony that "he feared for his own safety." Then, after invoking the second standard, the court stated that Bales had "observed … violent behavior" and had "reported the incidents of threats to other residents" at WMHI. The court explained that it did not consider Paul's hair-cutting as "an example of dangerousness" because Dr. Bales had testified that it was only *possible* that that behavior was the result of Paul having a delusion about "worm infestation" or parasites in his head. The court went on, however, to conclude that the County had established dangerousness under the second standard "by evidence of violent behavior. Including overt acts that the Doctor observed. The urination, the attempts to threaten other people in Winnebago, all of which is contained with the Doctors reports …." Following the hearing, the circuit court entered orders

imposing the six-month commitment and continuing involuntary medication and treatment.[4]

## DISCUSSION

¶15 A person may be committed involuntarily under WIS. STAT. § 51.20(1)(a) if the government establishes that the person is mentally ill, a proper subject for treatment, and dangerous. *Portage County v. J.W.K.*, 2019 WI 54, ¶17, 386 Wis. 2d 672, 927 N.W.2d 509. Because involuntary commitment significantly restricts a person's liberty, due process requires the government to establish the elements for commitment by clear and convincing evidence. *Waupaca County v. K.E.K.*, 2021 WI 9, ¶27, 395 Wis. 2d 460, 954 N.W.2d 366; *see also* WIS. STAT. § 51.20(13)(e). This court defers to the circuit court's factual findings unless they are clearly erroneous but reviews de novo whether those facts satisfy the statutory standard for dangerousness. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783. This court also accepts "reasonable inferences from the facts available to the circuit court." *Outagamie County v. Melanie L.*, 2013 WI 67, ¶38, 349 Wis. 2d 148, 833 N.W.2d 607.

¶16 Paul concedes that the County established that he is mentally ill and a proper candidate for treatment. His appeal focuses on the third requirement— dangerousness. Paul does not challenge the circuit court's factual findings related to that element, but instead argues that those findings did not establish dangerousness under the second standard, WIS. STAT. § 51.20(1)(a)2.b. "Thus, we

---

[4] After the commitment and medication orders were entered, the circuit court for Kenosha County transferred this case back to the circuit court for Racine County pursuant to a stipulation between the parties.

review the evidence presented at the final hearing and the circuit court's findings to decide whether there was clear and convincing evidence that [Paul] was dangerous as defined under [§] 51.20(1)(a)2.b." *See Marathon County v. D.K.*, 2020 WI 8, ¶44, 390 Wis. 2d 50, 937 N.W.2d 901.

¶17 As referenced above, a finding of dangerousness under the second standard requires proof that an individual "[e]vidences a substantial probability of physical harm to other individuals." WIS. STAT. § 51.20(1)(a)2.b. A "substantial probability" means "much more likely than not." *D.K.*, 390 Wis. 2d 50, ¶35. The statute also specifies that the "substantial probability of physical harm" must be "manifested by evidence of":

(1) The individual's "recent homicidal or other violent behavior," or

(2) "[A] recent overt act, attempt or threat to do serious physical harm" that places other individuals "in reasonable fear of violent behavior and serious physical harm."

*Id.*, ¶36; § 51.20(1)(a)2.b. To phrase the statute a different way, the County's burden was to establish that "it is much more likely than not that [Paul] will cause physical harm to other individuals," *see D.K.*, 390 Wis. 2d 50, ¶42, through evidence of Paul's "recent homicidal or other violent behavior" or a recent "act, attempt or threat to do serious physical harm" that placed others "in reasonable fear of violent behavior and serious physical harm," *see* § 51.20(1)(a)2.b. Medical experts who provide evidence in involuntary commitment proceedings need not parrot statutory language, but their "testimony and conclusions 'should be linked back to the standards in the statute.'" *D.K.*, 390 Wis. 2d 50, ¶54 (quoting *Melanie L.*, 349 Wis. 2d 148, ¶97).

¶18    Paul contends that the evidence cited by the circuit court in finding him dangerous—the portions of Bales's report and testimony about Paul urinating on the floor and threatening others at WMHI—does not satisfy the second standard. As to the urination incident, Paul argues that Bales did not explain how that act created a substantial probability of physical harm to anyone. In addition, he contends that Bales's testimony that Paul threatened other patients was too vague because he did not identify any specific words or acts that were threatening or when the threats occurred. Paul also contends that Bales contradicted his report when he testified at the final hearing that he was not aware of Paul expressing threats of harm to others. Finally, Paul acknowledges that Bales testified that Paul "caused other patients to fear him" but emphasizes that Bales "did not identify any specific instance in which another patient feared [Paul] or what action by [Paul] provoked such fear."

¶19    This court disagrees with Paul and concludes that the evidence introduced at the hearing clearly and convincingly established that he was dangerous under the second standard. Bales's report recounted Paul's threats and "preattack postures" towards police when he was first detained on August 2. Bales also relayed that Paul was brought in yelling and screaming, with dried blood on his head, and urinated on the hospital floor while claiming to be "marking his territory." He testified that Paul's behavior caused him to fear for his safety. Given Paul's appearance and behavior, it was reasonable for Bales to fear that Paul would act violently towards him and cause him serious physical harm. This reasonable fear supports a finding that Paul evidenced a "substantial

probability of physical harm to other individuals." *See* WIS. STAT. § 51.20(1)(a)2.b.; ***D.K.***, 390 Wis. 2d 50, ¶41.[5]

¶20    To be sure, the County could have done a more thorough job presenting evidence at the hearing that would have established a stronger link between Paul's behavior and the second standard.  Specifically, the County could have:  (1) called Dr. Patel to testify about the psychotic and violent behavior that preceded Paul's initial detention as well as the multiple examples of Paul acting in a threatening and violent manner towards patients and staff at WMHI that are noted in her report and to explain why, in her opinion, those incidents showed that Paul was dangerous; or (2) elicited more detailed testimony from Bales as to the behavior that precipitated his initial detention and the threats Paul made against other patients at WMHI and why, in his view, those threats could give rise to a "reasonable fear of violent behavior and serious physical harm" and establish a "substantial probability" that Paul would physically harm other individuals.  *See* WIS. STAT. § 51.20(1)(a)2.b.  In addition, in announcing its findings, the circuit court could have cited the descriptions of Paul's violent and threatening behavior that are discussed in detail in Patel's report.[6]

¶21    In recent years, our supreme court and this court have reminded counsel who handle involuntary commitment proceedings of the need to make a

---

[5] Because this court concludes that Paul's conduct on August 2, 2022, was sufficient to establish dangerousness, it need not address Bales's references to Paul's subsequent threats against other patients at WMHI.

[6] Although the County did not introduce Patel's report into evidence at the hearing, the circuit court could still consider and rely upon it in issuing Paul's initial commitment and medication orders. *See* ***Outagamie County v. L.X.D.-O.***, 2023 WI App 17, ¶34, 407 Wis. 2d 441, 991 N.W.2d 518.

detailed and thorough record given the significant infringement on a person's constitutionally-protected liberty interest that involuntary commitment can impose. *See, e.g.*, ***D.K.***, 390 Wis. 2d 50, ¶55 ("A commitment is no trivial matter. Taking more time at the circuit court can save years of uncertainty on appeal."); ***Winnebago Cnty. Dep't of Human Servs. v. L.J.F.G.***, No. 2022AP1589, unpublished slip op. ¶16 n.3 (WI App Apr. 12, 2023) (observing that many appeals under WIS. STAT. chs. 55 and 51 "could be avoided entirely if counties would take just a little more time and care to ask a few additional thoughtful questions or otherwise present additional evidence—such as reports, for example—that would help to more clearly satisfy statutory standards"). The author of this opinion endorses those remarks and urges counsel, where appropriate, to devote the additional time and care needed in commitment hearings when making an evidentiary record to support a commitment order.

¶22 For the reasons stated above, the circuit court correctly concluded that the County had carried its burden of establishing that Paul was dangerous under WIS. STAT. § 51.20(1)(a)2.b.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.