COURT OF APPEALS
DECISION
DATED AND FILED

April 12, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP2186**

STATE OF WISCONSIN

Cir. Ct. No. 2016ME157

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE MENTAL COMMITMENT OF C. J. A.:

OUTAGAMIE COUNTY,

    PETITIONER-RESPONDENT,

 V.

C. J. A.,

    RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Outagamie County: JEFFREY R. WISNICKY, Judge. *Affirmed*.

¶1 HRUZ, J.[1] Catherine[2] appeals a recommitment order entered pursuant to WIS. STAT. § 51.20. Catherine argues that Outagamie County did not

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2021-22). All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

prove, by clear and convincing evidence, that she is currently dangerous pursuant to § 51.20(1)(a)2.b. and the recommitment standard in § 51.20(1)(am); therefore, she claims that her commitment should be vacated. Specifically, Catherine alleges that the County failed to establish her current dangerousness and instead presented evidence only regarding her past dangerousness and potential future dangerousness. Catherine also asserts that the County failed to prove there is a substantial likelihood that she would become dangerous if treatment were withdrawn.

¶2 We conclude that the County met its burden to show that Catherine is currently dangerous, as well as the other required elements, for her to be recommitted under WIS. STAT. § 51.20. We therefore affirm.

## BACKGROUND

¶3 Catherine started receiving mental health services from the County in April 2012 as a condition of her probation. She was placed on probation following her prosecution for threatening a judge in 2011. In 2015, Catherine's treatment became voluntary, after which she discontinued treatment and her mental health decompensated.

¶4 In early September 2016, Catherine was emergently detained, under WIS. STAT. § 51.15, after allegedly making violent threats toward the same judge and appearing at that judge's home with a knife. Later that month, after a hearing, Catherine was involuntarily committed under WIS. STAT. § 51.20 for a period of

---

[2] For ease of reading, we refer to the appellant in this confidential appeal using a pseudonym, rather than her initials.

six months.  Since then, Catherine has been consecutively recommitted six times for periods of twelve months each.  Catherine has contested most of her recommitments.

¶5      In September 2022, the County timely filed another petition to recommit Catherine, which is the petition at issue in this appeal.  A hearing on the petition was held in October 2022, during which the County presented two witnesses: Dr. Marshall Bales, who is Catherine's treating psychiatrist, and Russ Marmor, who is a clinical coordinator for the County.[3]  No report from an independent doctor was prepared for this extension hearing.

¶6      Doctor Bales testified that he believed Catherine's diagnosis to be "either schizophrenia or … schizoaffective disorder."  Bales also testified that Catherine "has been fairly asymptomatic" and has "been stable on the medication" during her most recent period of commitment.  He stated that Catherine is "on a very low dose"—"almost a pediatric dose"—of Abilify, an injectable antipsychotic medication.  Bales opined that the dosage was the minimum amount necessary to prevent Catherine's symptoms from breaking through and leading to her becoming unstable, thereby needing to be hospitalized or being otherwise harmed.  According to Bales, Catherine is mostly compliant with medication, but she tends to embellish the medication's side effects.

¶7      Despite Catherine's compliance with her medication, Dr. Bales also explained that she only takes the medication because a circuit court has ordered

---

[3] Marmor worked with Catherine directly when she was first committed in 2016 and as a therapeutic/case manager from July 2018 until February 2020.  After that, he worked with her in a supervisory capacity.

her to do so. Bales opined that "without a commitment in place," Catherine will "stop her medication," because she adamantly believes she does not need it, and will "be done with Outagamie County case management and services in general." Notably, Bales twice stated that Catherine will stop taking her medication and "will become endangered or dangerous again" if treatment is withdrawn. While he opined that there will be "some kind of dangerousness," he could not predict the particular form such dangerous behavior would take.

¶8     One other prominent problem, according to Dr. Bales, is that Catherine lacks insight into her mental health and "just does not accept that she has a mental health condition." Catherine's condition, Bales testified, also contains a "mood component" that results in Catherine becoming "dysphoric" and "very angry, irritable, [and] labile." In the past, Bales explained, the irritability and the dysphoria have "been very prominent with her … to the point where in the past [Catherine] has been threatening."

¶9     In addition, Dr. Bales described that, in his past appointments with Catherine, there was an issue with Catherine focusing on her prior incidents of threatening a judge, even though Bales tries to avoid the subject with her.[4] During cross-examination, Bales testified that Catherine continues to deny ever having threatened a judge in the past. Bales further testified that Catherine has not made any new threats while on her current treatment regimen.

---

[4] Doctor Bales explained that he tries to avoid the subject of Catherine threatening a judge because "[s]he's got this viewpoint, almost a persecutory demeanor about it, and I … just don't think it's been productive to bring it up every visit with her. She just gets upset, it ruins her day, and it is just not helpful."

4

¶10    Doctor Bales acknowledged that Catherine had been able to "keep appointments" and "take her medication"[5] and that there had been no "recent dangerousness, recent hospitalization," or "recent crisis or police contact." Bales stated that Catherine was even able to maintain employment during this time period.

¶11    Marmor testified that the 2016 emergency detention was sought for Catherine due to her threatening a judge. These threats, Marmor opined, are "well documented" and were "homicidal threats." Additionally, Marmor testified that when Catherine has not been receiving treatment in the past, she has decompensated. Marmor further stated that, in the past, Catherine has been very focused on "persecutory delusions" and would become very "angry, agitated, accusatory, [and] irritable."

¶12    Marmor also testified that Catherine had been stable for the last twelve months—and had not had any hospitalizations or police contact during that time—because of the medication she was receiving. Marmor stated that Catherine had also been able to maintain a job during the prior year. Marmor opined that Catherine would benefit from more intensive services from the County, but she receives only the minimum services necessary to maintain her stability. Indeed, and similar to Dr. Bales, Marmor further testified that Catherine frequently states that she does not want to be on medication and that she does not want to engage in treatment with the County. Also, and again similar to Bales, Marmor noted that he

---

[5] Again, Dr. Bales noted that Catherine only takes her medication "because she has to" due to the circuit court order.

did not personally witness any of the threats that Catherine made in the past. Marmor testified that he had not heard Catherine make any subsequent threats.

¶13     In an oral ruling, the circuit court concluded that Catherine met the elements for recommitment, and it entered an order extending her commitment for a period of twelve months.  The court found Catherine's diagnosis to be schizoaffective disorder, a mental illness that is "a substantial disorder of thought, mood, [and] perception."  The court also determined that the illness was treatable.[6]

¶14     As to dangerousness, the circuit court determined that Catherine was dangerous under WIS. STAT. § 51.20(1)(a)2.b. as combined with § 51.20(1)(am). The court correctly noted that under § 51.20(1)(am), the County could establish Catherine's current dangerousness "by showing that there [wa]s a substantial likelihood based on [Catherine's] treatment record that [she] would be a subject for commitment if treatment were withdrawn."

¶15     Applying that standard, the circuit court first fully credited the evidence that without the WIS. STAT. ch. 51 commitment, Catherine would both stop taking her medication and stop seeing County health providers.  Turning then to the question of what would likely happen thereafter, the court cited the evidence regarding Catherine's prior behavior after she chose not to take medication without a court order.  Specifically, the court cited the testimony that, without treatment, Catherine "would become very angry, irritable, labile … dysphoric" as well as "unstable" and paranoid.  The court also tied this "baseline irritability" to how easily upset Catherine still becomes when the topic of her threatening a judge

---

[6] Catherine does not challenge the circuit court's finding that she has a mental illness and that she is a proper subject for treatment.  *See* WIS. STAT. § 51.20(1)(a)1.

comes up. The court specifically found that absent treatment, Catherine's prior symptoms would "come forward" and she would again begin engaging in threatening behaviors that would place others in fear of violence and serious physical harm. The court noted that it was "not here to … adjudicate" the details regarding Catherine's prior threats to a judge, but it could rely on the history showing that many people, including Catherine's own family members, believed the threats were made and "reasonably believed that [Catherine was] going to harm [others] with violent behavior."

¶16 The circuit court characterized its ruling as "close" and noted in its findings that Catherine does make it to "appointments, [there have] been no hospitalizations, no recent crises … no police calls" and that Catherine does have a job. Nevertheless, despite this "good year," and consistent with its comments as noted above, the court expressly found that there was "no question" that the threatening behavior that she exhibited in the past remained "right below the surface" and was only being kept at bay by a low dosage of psychotropic medication. The court did not extend Catherine's involuntary medication order. Catherine now appeals the recommitment order.

## DISCUSSION

¶17 On appeal, Catherine does not contest the circuit court's finding that she would, in fact, not take her current mental health medication if her commitment ended. Rather, the gravamen of her argument is that the County did not prove that if she makes such a choice, she would be currently dangerous under the recommitment standards. Specifically, she faults the County's evidence as "only" consisting of "stale and vague allegations of [her] past threats."

¶18    "In order to involuntarily commit a person pursuant to [WIS. STAT.] ch. 51, the petitioner must demonstrate that three elements are fulfilled: the subject must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to themselves or others." *Sheboygan County v. M.W.*, 2022 WI 40, ¶17, 402 Wis. 2d 1, 974 N.W.2d 733.   These same three elements are necessary for a petitioner to prevail in a recommitment proceeding, such as the one in this case.   *Id.*, ¶18.   WISCONSIN STAT. § 51.20(1)(a)2.a.-e. lists five dangerousness standards under which a petitioner can prove an individual is currently dangerous.  *Waupaca County v. K.E.K.*, 2021 WI 9, ¶28, 395 Wis. 2d 460, 954 N.W.2d 366.  The second dangerousness standard, at issue here, is met if an individual

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

Sec. 51.20(1)(a)2.b.   A "substantial probability" means "much more likely than not."  *Marathon County v. D.K.*, 2020 WI 8, ¶35, 390 Wis. 2d 50, 937 N.W.2d 901.

¶19    "Because an individual's behavior might change while receiving treatment, WIS. STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior to the commencement of the extension proceedings." *Portage County v. J.W.K.*, 2019 WI 54, ¶19, 386 Wis. 2d 672, 927 N.W.2d 509. Section 51.20(1)(am) states that the "requirements of a recent overt act, attempt or threat to act under par. (a)2.a. or b. … may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the

individual would be a proper subject for commitment if treatment were withdrawn." Importantly, even when using the § 51.20(1)(am) evidentiary path to prove dangerousness, the petitioner must still prove that the person is currently dangerous. *K.E.K.*, 395 Wis. 2d 460, ¶25; *J.W.K.*, 386 Wis. 2d 672, ¶¶24-25.

¶20 Whether the County met its burden to establish current dangerousness is a mixed question of law and fact. *See Langlade County v. D.J.W.*, 2020 WI 41, ¶24, 391 Wis. 2d 231, 942 N.W.2d 277; *K.N.K. v. Buhler*, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987). The circuit court's factual findings will not be overturned unless they are clearly erroneous. *D.J.W.*, 391 Wis. 2d 231, ¶24. However, we independently review whether the facts satisfy the applicable legal standard. *Id.*, ¶25.

¶21 We conclude that the County's evidence was sufficient to meet its burden to prove current dangerousness. We also perceive the circuit court's legal analysis of how the underlying evidence intersected with the applicable legal standards to be sound, and we essentially adopt it as our own after our de novo review.

¶22 Fundamentally, Catherine is incorrect in contending that the circuit court's determination of her current dangerousness was based only on her past dangerousness and impermissibly speculative future dangerousness. As an initial matter, the court was plainly aware that the County was required to prove that Catherine was *currently* dangerous, as it expressly noted and applied that standard. Catherine's arguments are really disagreements with many of the court's factual findings—including its crediting some of the testimony of Catherine's treatment professionals—and especially with its application of those findings to conclude that she is currently dangerous.

9

¶23 Without recounting in full all of the evidence discussed above, *see supra* ¶¶6-12, the facts derived from the record—including the testimony of Dr. Bales and Marmor—and as found by the circuit court are, if accepted, sufficient to support a finding of current dangerousness and, thus, continue Catherine's commitment. In particular, certain factual determinations largely resolve this case, and Catherine never contends, at least directly, that any of them are clearly erroneous.[7] Whether Catherine needs her medication (no matter how small its dose) in order to avoid decompensating in terms of her mental illness; whether she would not take that medication absent a court order (which, again, she appears to concede on appeal would occur); and whether she would then exhibit symptoms that are much more likely than not to lead her to engage in violent and threatening behavior against others are all questions of fact, on which we must defer to the circuit court because the court's findings are not clearly erroneous. *See D.J.W.*, 391 Wis. 2d 231, ¶24. The court answered each of these questions in a manner plainly supporting a recommitment, and there is evidence in the record to support these findings.

¶24 The witnesses' testimony was of particular import. Dr. Bales' expert opinions, which support the circuit court's findings on the operative questions, were neither conclusory nor without foundation. And Marmor tied Catherine's symptoms to her *continued* focus on "persecutory delusions," which included delusions regarding the justice system. *See Outagamie County v. C.A.*,

---

[7] While Catherine takes issue with many of the circuit court's factual findings, she never contends on appeal that any of them are clearly erroneous by developing a specific argument in that regard.

No. 2017AP450, unpublished slip op. ¶¶3-4 (WI App Jan. 23, 2018).[8] In short, the witnesses testified on all of the most relevant subjects in a way such that the court could answer those questions in a manner that supported a finding of current dangerousness and therefore satisfied the legal standard for extending Catherine's commitment.

¶25 Catherine's attempt to discount the foregoing focuses on facts that are favorable to her but that do not make any of the circuit court's primary findings clearly erroneous. To be sure, Catherine is "doing well" now, albeit while under treatment. She has maintained a job, has a stable life, and has not engaged in recent dangerous behaviors. Additionally, she currently needs only a low dose of psychotropic medicine and minimal outpatient treatment to abate the symptoms of her mental illness. None of those facts, however, negate the relevant factual underpinnings necessary to conclude that Catherine would become dangerous toward others if her treatment were withdrawn entirely. Catherine criticizes the County's evidence and witnesses due to the allegedly insufficient amount of time during which Dr. Bales personally meets with Catherine each year; Bales' lack of specificity as to why, when or how, precisely, Catherine's reemerging symptoms would lead to dangerous behavior; and the notion that all people can get "irritable," and have the right to do so, especially after being committed for years. These criticisms, however, largely go to the weight that the circuit court, as the fact finder, could choose to give to witnesses' opinions.

---

[8] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b). We cite to this unpublished case solely to note that as early as 2018, Catherine was found—as a matter of law—to have held persecutory delusions about the justice system. The record from Catherine's most recent hearing shows she is still suffering from these same delusions.

¶26     Catherine lodges other criticisms that do nothing to show that the circuit court's findings are insufficient to meet the applicable legal standards. Contrary to Catherine's assertions, the County did not simply show that she was "at one point dangerous" in 2016, which would be an improper basis on which to recommit her. *See Outagamie County v. C.J.A.*, 2022 WI App 36, ¶19, 404 Wis. 2d 1, 978 N.W.2d 493.  Neither logic nor case law require that the County, in a recommitment proceeding, present evidence that predicts precisely when and how a subject's symptoms will reemerge or when and how he or she will act dangerously due to those symptoms. *See Winnebago County v. S.H.*, 2020 WI App 46, ¶16, 393 Wis. 2d 511, 947 N.W.2d 761 (concluding that that subject individual was dangerous under WIS. STAT. § 51.20(1)(a)2.c and (1)(am) when she did not believe that she was mentally ill and had a history of repeatedly opting to discontinue her medication, leading to dangerous behavior requiring recommitment); *Outagamie County v. R.W.*, No. 2020AP1171-FT, unpublished slip op. ¶¶23-25, 30 (WI App Dec. 17, 2020) (concluding that the subject individual was dangerous under § 51.20(1)(am) due to testimony that, if her commitment was not extended, the individual would repeat a cycle of being released from her commitment, stop taking her medication, behave dangerously, and again be involuntarily committed).  Catherine certainly does not cite any authority to the contrary.  Nor, as Catherine asserts on appeal, did the County's evidence merely show "[a] possibility of symptoms reemerging at some undisclosed point in the future."

¶27     Finally, the fact that Catherine was on only a low dose of her psychotropic medication and was not acting dangerously on that dosage does not disprove the testifying professional's strong opinion that if Catherine stops taking that dosage, her underlying symptoms *will* return and those symptoms *will* lead

12

her to behave violently toward others. The circuit court certainly could have found to the contrary based on the medication dosage (and other considerations), but it was not required to do so. And, once those opinions are credited, they satisfy the legal standards under WIS. STAT. § 51.20(1)(a)2.b. and (1)(am).

¶28 We note that WIS. STAT. § 51.20(1)(am) was amended in furtherance of

> Avoid[ing] the "revolving door" phenomena whereby there must be proof of a recent overt act to extend the commitment but because the patient was still under treatment, no overt acts occurred and the patient was released from treatment only to commit a dangerous act and be recommitted. The result was a vicious circle of treatment, release, overt act, recommitment. The legislature recognized the danger to the patients and others of not only allowing for, but requiring, overt acts as a prerequisite for further treatment.

*K.E.K.*, 395 Wis. 2d 460, ¶36 (citation omitted). The County introduced evidence that: (1) Catherine has improved due to the treatment she has received while committed; (2) Catherine has expressed that she will not continue taking her medication or working with the County's treatment services upon being released from her commitment; and (3) absent such treatment, Catherine will decompensate to the state she was in prior to her commitment. The case law is clear that, under these circumstances, a patient may be recommitted under § 51.20(1)(am) in combination with any of the standards of dangerousness set forth in § 51.20(1)(a)2.a.-e.

¶29 One of Catherine's arguments on appeal requires separate attention from the foregoing issues. Namely, Catherine also argues, as she has in prior appeals of her recommitment orders, that the County's evidence regarding her prior threats to a judge was "scant," "unproven," and—especially as to the notion

of the threats being "homicidal" in nature—lacked context. These failings, she maintains, are true both as to the current recommitment proceeding as well as the original commitment proceeding. Essentially, Catherine asserts that the County cannot be deemed to have proved, in this particular recommitment proceeding, the veracity of her prior violent threats to a judge.

¶30 We disagree with Catherine's legal arguments and her concerns attendant to them in this regard. First, we note that we need not address this argument, as it is undeveloped, at least in one sense. *See* ***State v. Pettit***, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (court of appeals need not address undeveloped arguments or arguments unsupported by references to legal authority). Namely, Catherine essentially raises a hearsay argument as to Dr. Bales and Marmor relying on "treatment records" for information regarding her alleged threats to a judge. However, Catherine does not allege that she objected to said hearsay at the recommitment hearing, nor does she provide this court with an analysis of whether the plain error doctrine applies to the alleged hearsay. *See* WIS. STAT. § 901.03(4); ***State v. Jorgensen***, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77.

¶31 Furthermore, and more importantly, the circuit court's factual findings regarding Catherine's threats were not clearly erroneous—precisely because the court expressly noted that it was *not* adjudicating the dispute over her threats to a judge. The court, in addressing Catherine at the recommitment hearing, stated:

> I'll take you at your word you didn't [threaten a judge], but there [were] enough people around you that were concerned that you were making threatening—or acting in a threatening manner to others…. Certainly, … others around you believed that you were making threats to harm

14

someone and they reasonably believed that you were going to harm them with violent behavior.

This statement shows that the court carefully considered the evidence before it, including the possibility that Catherine did not directly threaten a judge. The court correctly considered Dr. Bales' testimony that Catherine disputes ever threatening a judge and the fact that others were placed in reasonable fear of her violent behavior.[9]

¶32 While Dr. Bales and Marmor did refer to the past allegations regarding the nature of Catherine's alleged threats to a judge during their testimony, and while the County has similarly referred to those threats on appeal, the circuit court properly relied on Catherine's overall attitude and behavior, some of which existed as a basis for her initial commitment, in finding that she was currently dangerous. Indeed, in disposing of Catherine's direct appeal of her initial commitment, we stated:

> We need not address [Catherine]'s argument about the lack of any credible or admissible evidence that she threatened anyone. Regardless of any threat, the County presented evidence of several recent acts demonstrating that [Catherine] had a need for treatment to prevent further deterioration. The evidence showed that after [Catherine]'s court order for medication expired she exhibited, with increasing frequency, a delusional thought process regarding the justice system. In particular, [the police officer] noted [Catherine] displayed delusional thought processes, angry tone, and ravings about legal persons and the court system during his multiple contacts at her mother's residence, all of which left him feeling

---

[9] To the extent that Catherine means to argue that it would not have been reasonable for the specific judge to have been in fear of harm due to her threat, we note that WIS. STAT. § 51.20(1)(a)2.b. is satisfied so long as "others are placed in a fearsome position by a disturbed person's actions even if the person placed in that position has no subjective awareness of it." **R.J. v. Winnebago County**, 146 Wis. 2d 516, 522-23, 431 N.W.2d 708 (Ct. App. 1988).

15

"uncomfortable." [The clinical therapist] similarly observed [Catherine's] "decompensating" mental health prompted other family members to contact [the clinical therapist] out of concerns for their safety. All three of the County's witnesses testified in some form that [Catherine's] mother was fearful due to [Catherine's] behavior.

*C.A.*, No. 2017AP450, ¶10.

¶33 Thus, during the litigation of Catherine's initial commitment, she was found to have put others in reasonable fear of an individual's safety due to the threats that she made and her underlying persecutory delusions regarding the justice system. That finding was then upheld on appeal as a proper legal basis upon which to affirm her initial commitment. As such, it was valid for the witnesses at this recommitment hearing to refer in general to those threats, *as long as* they presented evidence that Catherine remained currently dangerous and did not rely only on those prior circumstances. As explained, we conclude that such proof of current dangerousness occurred here.

¶34 All this said, we understand and appreciate Catherine's concerns about the County—and its witnesses—relying to any degree on factual allegations that, apparently, have never been proven in any tribunal to date. However, there is simply no basis, given the overall record, for us to conclude that there was reversible error by the circuit court in ordering the recommitment as it did here.

¶35 In all, the circuit court properly applied the dangerousness standard in WIS. STAT. § 51.20(1)(a)2.b. through the § 51.20(1)(am) lens. This case represents a proper application of those two legislatively created means of continuing a WIS. STAT. ch. 51 commitment—even one that has, unfortunately, lasted as long as Catherine's. Going forward, and as is required by governing

statutory and case law, each individual recommitment hearing involving Catherine *will* continue to require the County to prove each element with the requisite quantum of proof, *see **J.W.K.***, 386 Wis. 2d 672, ¶¶24, 28.  As such, Catherine will continue to have her liberty interests protected accordingly.[10]

> *By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[10] Understandably, Catherine focuses on the circuit court's statements that this was "a close case" and that the County "barely" met its burden, going so far as to conclude its comments with an admonition to the County's attorney that

> [a]t some point very near, if this continues that she is doing very well, I think it's harder and harder to meet your burden.  And I understand this behavior—the underlying behavior that we are all very concerned about, but we still have to have the requisite burden of proof.

We have no cause to disagree with this assessment, especially given the amount of time that Catherine's commitment has lasted.  Indeed, the circuit court's decision not to reinstate the involuntary medication order has given Catherine an opportunity to demonstrate her ability to personally adhere to her wellbeing without more stringent oversight.

However, the circuit court's comments do not change the fact that the court did conclude that the County met its burden at this recommitment hearing.  In any event, the question of whether the legal standards have been met, given the court's factual findings, is a question of law that we have reviewed de novo.  We merely share the court's legal assessment in that regard.