**COURT OF APPEALS
DECISION
DATED AND FILED**

**April 23, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.  2025AP1838
2025AP1839
STATE OF WISCONSIN**

Cir. Ct. No. 2024ME23

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF D.C.:

JACKSON COUNTY,

PETITIONER-RESPONDENT,

V.

D.C.,

RESPONDENT-APPELLANT.

APPEALS from orders of the circuit court for Jackson County: DANIEL S. DIEHN, Judge. *Reversed.*

¶1     BLANCHARD, J.[1]  D.C. appeals circuit court orders committing him and subjecting him to involuntary medication and treatment under WIS. STAT. ch. 51.  One set of orders resulted from the initial commitment proceedings in December 2024.  A second set extended the commitment and involuntary medication and treatment in June 2025.[2]  Because I conclude that Jackson County failed to meet its burden to show that D.C. was dangerous at both the original commitment hearing and at the extension hearing, I reverse the resulting orders.

## BACKGROUND

### I.  The initial commitment proceedings

¶2     The initial commitment proceedings arose out of a criminal case.  In the criminal case, D.C. was found incompetent to stand trial and unlikely to become competent within the statutory period, which in that case was one year from the beginning of his treatment.  *See* WIS. STAT. § 971.14(5)(a) and (6).  The circuit court ordered that the criminal case be converted to a WIS. STAT. ch. 51 civil commitment proceeding under § 971.14(6)(a)-(b).  Under these provisions, when a court discharges a criminal defendant from a commitment for competency on the ground that it is unlikely that the defendant will become competent within the remaining commitment period, the court may take steps that convert the case into such a civil commitment proceeding.

---

[1]  This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

[2]  These appeals were consolidated for disposition by an order dated April 14, 2026. *See* WIS. STAT. RULE 809.10(3).

¶3      These commitment proceedings culminated in a trial to the circuit court in December 2024.  The County called two expert witnesses: Jeffrey Marcus, a psychiatrist, and James Black, a psychologist.  Both had reviewed records and spoken with D.C., and they opined, as relevant here, that D.C. was dangerous under two statutory standards: the second (danger to others) and the fifth (incompetency to refuse medication and a substantial probability of resulting harm).  *See* WIS. STAT. § 51.20(1)(a)2.b. and e.  I summarize the testimony on each standard in turn.

### A.  Testimony on the second standard

¶4      The evidence going to dangerousness to others centered on two incidents.  The first occurred in July 2022, and it gave rise to the criminal charges against D.C.  This incident involved D.C.'s high-speed attempt to elude pursuing police vehicles.  The County called a sheriff's deputy who had been one of the pursuers.  The deputy testified that D.C. had driven at speeds substantially exceeding 105 miles per hour while being pursued by police.

¶5      Asked whether D.C. posed a danger to others, Dr. Marcus referred to this eluding incident.  Dr. Marcus testified that he was "worried about behavior that would occur during acute psychosis [similar to] the incident which occurred back in 2022."  On cross-examination, however, Dr. Marcus testified that he was unaware of any professional examination of D.C. from around the time of the 2022 incident that would support his suggestion that D.C. had been in a state of acute psychosis at the time of the eluding.

¶6      The second incident occurred at a mental health facility at which D.C. was confined during the criminal competency proceedings.  D.C. arrived at the facility about five and one-half months before the WIS. STAT. ch. 51 hearing.

An employee of the facility testified that D.C. had refused to go into the cell in which he was to be held, and became "increasingly aggressive." Once in the cell, D.C. acted "very angry," "voic[ed] how he was going to kill us," and punched the door of the cell.

### B. Testimony on the fifth standard

¶7     A second employee of the mental health facility testified that, at some point during D.C.'s time in the facility, D.C. refused to eat "several meals." The employee further testified that "it is part of the protocol of the institution if you miss a certain number of meals, they will initiate a hydration and nutrition order … with the court" and that such an order had been entered in D.C.'s case. Apparently relying on records reflecting that D.C. did not eat some meals, Dr. Marcus testified to a "significant impairment of oral intake" on D.C.'s part. At the same time, Dr. Marcus's report noted that D.C. had been eating since his transfer to a different facility. Additionally, Dr. Marcus testified that he saw no indication that D.C. was underweight, "nutritionally deficient," or "nutritionally compromised."

¶8     Both Dr. Marcus and Dr. Black opined that D.C. met the fifth standard of dangerousness. Dr. Marcus testified that he was concerned that D.C. "would be unable to satisfy" his needs for nourishment, medical care, and safety if he did not have treatment "to the point where he would be a danger to himself," and that "his nutrition would [be] compromise[d] and that he could put himself at risk in that way." Asked whether D.C., "in his current state, would be able to prevent further disability or deterioration without a commitment," Dr. Marcus responded:

> I don't know. I don't know if there would be further disability or deterioration…. [I]n terms of weight loss, in terms of failure to thrive, perhaps. In terms of psychiatric deterioration, I don't know. I don't know if his psychosis would worsen if he remained untreated. I don't know.

Asked if D.C. would "avail himself of necessary services and treatment in the community" if not committed, Dr. Marcus responded:

> I don't know for certain. I would be concerned that he would not, but I don't know that I can state that to a reasonable degree of medical certainty. A lot of factors would go into that that I would have to speculate on, and … I don't know.

Asked for specific examples of how D.C.'s mental illness affected his judgment and behavior in a substantial way, Dr. Marcus again referred to the skipping of meals and resulting court order for nutrition.

¶9 When Dr. Black was asked whether there was a substantial probability that D.C. would experience further disability or deterioration in the absence of care or treatment, he responded "yes," and added that the "records would suggest lack of insight into his mental illness and need for treatment." Asked again what sort of disability or deterioration D.C. might risk, Dr. Black said "under [the] fifth standard you're looking at impaired judgment and the likelihood they would not seek treatment as needed." He then referred to instances of D.C.'s symptoms of mental illness: belief that his food was poisoned, hearing voices, lacking insight into his physical condition, and being nonverbal and "catatonic." Asked whether D.C. would lack services necessary for his health and safety if untreated in the community, Dr. Black responded that D.C. "does not have very good insight" into his mental illness and its effects on his functioning, and that he would not likely seek treatment or support. Asked variations of the same questions, Dr. Black again responded with general descriptions of the symptoms

5

of schizophrenia and the fact that D.C. had, in the past, refused medication. On cross-examination, Dr. Black also cited the skipping of meals, but he agreed that he did not have any reason to think D.C. was underweight.

¶10  The circuit court ordered D.C. committed for six months. Regarding dangerousness, the court determined that the County had proved both the second and the fifth standards. The court also ordered that D.C. be subjected to involuntary medication and treatment.

¶11  D.C. filed a postdisposition motion seeking reversal of these orders. In the motion itself and at the associated non-evidentiary hearing, D.C. argued that the County had adduced insufficient evidence of dangerousness. He also raised a constitutional claim, which is explained in the discussion below. The circuit court denied the motion, and D.C. appeals.

## II. The extension proceedings

¶12  In May 2025, the County filed a petition to extend D.C.'s commitment. At the resulting hearing, the County asserted only the fifth standard as a ground to find D.C. dangerous. Dr. Stephen Dal Cerro, a psychologist, was called as a witness by the County. Dr. Dal Cerro testified that D.C. "doesn't believe that he has psychosis." Dr. Dal Cerro also opined that, without medication, there would be a "predictable relapse into loss of his cognitive, and, sort of, volitional control." Dr. Dal Cerro testified that D.C., even when he was medicated, "shows a need for repeated prompts for even routine activities" and that D.C. was dependent on institution staff for direction because he had "very significant difficulty with independent decision making."

¶13     Asked whether the end of D.C.'s commitment would result in further disability or deterioration, Dr. Dal Cerro responded that it would.  He opined that D.C. "has an inability to function independently," "lacks basic self-preservation skills," and has "severe functional deficits."  Dr. Dal Cerro testified that D.C. would not pursue services voluntarily because he did not believe that he is mentally ill.

¶14     Dr. Dal Cerro was then asked whether the end of commitment would result in severe mental, emotional, or physical harm to D.C.  He replied that it would.  Asked how such harms would affect D.C.'s ability to function independently in the community, Dr. Dal Cerro replied that D.C. was "experiencing very pronounced and negative symptoms of schizophrenia, which render him to be in a state where he lacks volition, he lacks basic problem-solving, his cognition is highly impacted by his illness.  He would be … unable to do basic problem-solving."

¶15     The circuit court extended D.C.'s commitment.  It determined that the County had proved D.C. dangerous under the fifth standard, both based upon D.C.'s recent acts or omissions and because he would be a proper subject for commitment if treatment were withdrawn.  The court also entered an order for D.C.'s involuntary medication and treatment.  D.C. appeals.[3]

---

[3] The briefing in these cases, which was prolonged by requests for extensions to file appellate briefs, was not completed until both the initial and extended commitments had expired. D.C. has also informed the court that no further extension of his commitment was sought.  So, as far as I am aware, he is no longer under a commitment.  After being notified that these appeals were submitted to this court, neither party has suggested that these appeals may be moot or otherwise affected by the end of D.C.'s commitment.  Accordingly, I address the appeals as submitted.

## DISCUSSION

### I. General principles and standard of review

¶16    To secure an order committing a person under WIS. STAT. ch. 51, a petitioner must demonstrate that the person meets three criteria.  First, the person must be mentally ill.  WIS. STAT. § 51.20(1)(a)1.  Second, the person's condition must be treatable.  § 51.20(1)(a)1.  Third, the person must be dangerous. § 51.20(1)(a)2.  Although D.C. also challenges the circuit court's determination that he was treatable at the time of the extension of his commitment, this opinion addresses only the third criterion, dangerousness, as to both the initial commitment and the extension.

¶17    To be dangerous under WIS. STAT. ch. 51, a person must meet one or more of the five statutory standards laid out in WIS. STAT. § 51.20(1)(a)2.a.-e. These cases involve two of those five standards.

¶18    **The second standard**.  One of the two standards at issue here is contained in WIS. STAT. § 51.20(1)(a)2.b., the standard of dangerousness to others, which is implicated here only in the initial commitment.  A person is defined to be dangerous to others if the person evidences

> a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

§ 51.20(1)(a)2.b.

¶19    **The fifth standard**.  The other standard at issue here is contained in WIS. STAT. § 51.20(1)(a)2.e.  The statutory language describing this standard is

8

"long and complex," but our supreme court has explained that it consists of five elements. *State v. Dennis H.*, 2002 WI 104, ¶¶16, 19-24, 33, 255 Wis. 2d 359, 647 N.W.2d 851. The first two of these elements are not disputed on appeal. These two elements are that the person be mentally ill and that the person be incompetent to make decisions about medication or treatment due to mental illness. *Id.*, ¶¶19-21; § 51.20(1)(a)2.e. At issue here are the following elements of the fifth standard:

- The third element is that the person show a substantial probability of needing care or treatment to prevent further disability or deterioration. *Dennis H.*, 255 Wis. 2d 359, ¶22; § 51.20(1)(a)2.e.

- The fourth element is that the person show a "'substantial probability that he or she will, if left untreated, lack services necessary for his or her health or safety.'" *Dennis H.*, 255 Wis. 2d 359, ¶23 (quoting § 51.20(1)(a)2.e.).

- The fifth element is that the person show "'a substantial probability that he or she will, if left untreated, ... suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions.'" *Id.*, ¶24 (quoting § 51.20(1)(a)2.e.).

¶20 Both the second and fifth standards require a showing of a "substantial likelihood" that the potential harms will occur, which in this context means the petitioner must show that the dangerous outcome is "much more likely than not." *Marathon County v. D.K.*, 2020 WI 8, ¶¶35, 61, 390 Wis. 2d 50, 937 N.W.2d 901 (R. Bradley, J., concurring). The petitioner must make this showing by "clear and convincing evidence." WIS. STAT. § 51.20(13)(e).

¶21 In a WIS. STAT. ch. 51 proceeding, "[a] determination of dangerousness is not a factual determination, but a legal one based on underlying facts." *Langlade County v. D.J.W.*, 2020 WI 41, ¶47, 391 Wis. 2d 231, 942

N.W.2d 277. Accordingly, appellate courts review a ch. 51 commitment using a mixed standard, upholding the circuit court's factual findings unless they are clearly erroneous, but independently deciding whether these facts satisfy the legal standard. *Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783.

### II. There was insufficient evidence of dangerousness at the initial commitment hearing.

### A. The second standard

¶22 As noted, the County sought to show that D.C. was dangerous to others by relying on the eluding incident and the incident involving threats at the mental health facility. Taking into account the total evidentiary picture, I conclude that the evidence did not show D.C. to be dangerous at the time of the hearing.

¶23 There can be no dispute that the eluding was conduct that, at the time it occurred, would place others in "reasonable fear" of "serious physical harm." WIS. STAT. § 51.20(1)(a)2.b. But it is also true that there was no evidence presented connecting D.C.'s mental illness to the eluding incident. Apparently, no evaluation of D.C. was done at or near that time. D.C. also has a documented history of substance abuse issues, including during the time period in which the eluding incident occurred. As the circuit court noted, there were "certainly … reasons to question" whether D.C.'s behavior in the eluding incident "was the result of mental illness, or whether it was the result of substance use, or whether it was just the result of criminal behavior." This murkiness about the circumstances of the eluding incident, combined with the passage of two and one-half years, meant that this incident had a low probative value in the assessment of

dangerousness related to D.C.'s mental condition at the time of the commitment hearing.

¶24    Similarly, regarding the threats incident, the passage of nearly six months without any other reported incidents severely limits its probative value. The value is especially low in part because D.C. was not taking psychotropic medications during the great bulk of the intervening months. That distinguishes this case from those in which a lack of dangerous behavior can be attributed to the fact that the person has been undergoing treatment. WISCONSIN STAT. § 51.20(1)(am) provides in such cases that a person is dangerous if "the individual would be a proper subject for commitment if treatment were withdrawn." Here, there was no evidence that D.C.'s mental illness was being treated between the incident of threats and the hearing, and accordingly no reason to think the absence of behavior indicating danger to others was a product of treatment.

### B. The evidence is not sufficient under a proper construction of the recency definition.

¶25    I conclude that the two incidents, considered as part of the totality of the evidence, did not amount to proof that D.C. was much more likely than not to be dangerous to other people. I reach this conclusion in significant part because neither incident occurred close in time to the commitment hearing, and because the time intervals between the two incidents and the hearing did not suggest that D.C. remained dangerous.

¶26    In the circuit court and on appeal, the parties have disputed what weight, if any, the circuit court should have placed on the two incidents, given the passage of time. Their dispute centers on a statutory provision that I call "the

11

recency definition." The recency definition is the following sentence in WIS. STAT. § 51.20(1)(am):

> If the individual is committed under [WIS. STAT. §] 971.14(2) or (5) at the time proceedings are commenced, or has been discharged from the commitment immediately prior to the commencement of proceedings, [then] acts, attempts, threats, omissions, or behavior of the subject individual during or subsequent to the time of the offense shall be deemed recent for purposes of [§ 51.20(1)(a)2.].

¶27    D.C. argues that the recency definition violates due process, both on its face and as applied to him. Because I decide this issue in D.C.'s favor on a different basis, I decline to consider his constitutional arguments. *See **Sweet v. Berge***, 113 Wis. 2d 61, 67, 334 N.W.2d 559 (Ct. App. 1983) (appellate court need not address every issue raised by the parties when one is dispositive). Nevertheless, because my ultimate analysis on this issue depends in part on the passage of time between each of the two incidents and the hearing, I now explain how I interpret the recency definition for purposes of this appeal.

¶28    Taking the statutory cross references into account, the recency definition provides that, for someone like D.C.—whose initial WIS. STAT. ch. 51 commitment proceedings arise from the conversion of a criminal case in which he was found incompetent and not likely to become competent within the statutory time frame—the requirement of "recent" acts, omissions, or behavior found in each of the five dangerousness standards is altered in the following way. None of the following can be ignored as evidence on the ground that it does not constitute proof of "recent" events: the person's relevant conduct from the time of the commission of the offense, no matter the nature of the offense or how long before the final commitment hearing it occurred, and presumably running to the date of the hearing.

¶29    The recency definition came into play here during the final hearing, specifically with respect to the County's attempt to prove the second standard. At the beginning of the County's examination of a deputy who had been involved in the eluding incident, D.C. objected that the line of questioning was improper because the topic was "stale" and "not relevant" in light of the passage of two and one-half years since the incident. The County responded by citing the recency definition. Noting that the "provision recited by [the County] seems to suggest that statutorily it's deemed to be not stale," the circuit court permitted the testimony. But, in its order denying D.C.'s postdisposition motion, the court referred to the recency definition for the purpose of making clear that the court did *not* rely on it. The court said that the eluding incident and threats incident "meet the definition of 'recent' with or without the application of" the recency definition.

¶30    Like the circuit court, I conclude that the recency definition has no effect on the outcome here. By its terms, the recency definition establishes a period of time during which the person's acts must be considered "recent" in the sense that they count as evidence that could, depending on the specifics, support a conclusion of dangerousness under the five substantive standards. So, for example, while the second standard typically requires that dangerousness be shown by "recent homicidal or other violent behavior," or "a recent overt act, attempt or threat to do serious physical harm," WIS. STAT. § 51.20(1)(a)2.b., the effect of the recency definition is to set a firm date after which any behavior by the person is considered "recent." Stated in a negative manner, the recency definition

13

precludes a court from declining to take into account the person's conduct surrounding the offense strictly because it occurred too long in the past.[4]

¶31    However, the recency definition does not direct that the circuit court must disregard the passage of time since allegedly dangerous or threatening acts occurred, and I do not interpret it to imply any such direction. By "passage of time," I mean two related things.

¶32    The first is the simple fact that the passage of time can have meaning, often highly significant meaning, in the assessment of a person's *current* dangerousness. Here, for example, the eluding incident occurred two and one-half years before the commitment hearing, and the threats incident occurred five and one-half months before. It is generally understood that a person's mental condition and the person's behaviors can change in various ways over time, so that a person's behavior in the distant past is generally less probative than more recent behavior in assessing the person's current condition. *See, e.g.*, WIS. STAT. § 906.08(2) (permitting impeachment of a witness's character for truthfulness by acts "not remote in time"); *State v. Sullivan*, 216 Wis. 2d 768, 786, 576 N.W.2d 30 (1998) (stating that the probative value of "other acts" evidence depends in part on the "other incident's nearness in time").

¶33    The legislature recognizes this commonsense notion by providing that civil commitments—whether under WIS. STAT. chs. 51, 55, 980, or WIS.

---

[4] For this reason, I conclude that the circuit court properly applied WIS. STAT. § 51.20(1)(am) when it overruled D.C.'s objection to the deputy's testimony about the eluding incident. The alleged "staleness" of the eluding incident could go to its weight, but under the recency definition, the court was barred from ignoring it simply due to the passage of time in deciding whether D.C. was dangerous at the time of the hearing.

14

STAT. § 971.17—are temporary, or at the very least subject to periodic review. The fact that a person was dangerous or incapable of independent functioning at some point in the past does not necessarily show that the person is presently so. And, as a general matter, the further in the past a person acted dangerously or was seemingly incapable of independent function, the less likely it is that the condition persists now. I do not see anything in the language of WIS. STAT. § 51.20(1)(am), including the recency definition, that requires a judge or a jury to disregard this commonsense notion that is reflected in features of relevant statutes.

¶34 The second thing I mean by the "passage of time" is that, as time passes, events that have the potential to occur either do in fact occur or they do not. In this case, the evidence showed that the passage of time between the eluding incident and the threats incident, on the one hand, and the final hearing, on the other hand, was not marked by the recurrence of dangerous or threatening conduct by D.C., apart from the fact that the threats incident postdated the eluding incident. The fact that D.C. had apparently not engaged in any such conduct for some time preceding the hearing further weakens the significance of these two incidents in assessing his present condition at the hearing. Notably, during most of the intervening time, D.C. was not subjected either to psychotropic medication or to other treatment intended to ameliorate his mental illness. To repeat, the administration of such treatments in the typical case is what justifies the standard applicable to the extension of mental commitments under WIS. STAT. ch. 51, which permits a finding of dangerousness not based on any recent conduct, but based upon the likelihood that a person would become dangerous if treatment were withdrawn. *State v. W.R.B.*, 140 Wis. 2d 347, 351, 411 N.W.2d 142 (Ct. App. 1987). As noted above, it is only logical that the absence of such treatment of a person in the intervening period between prior dangerous conduct and the hearing

weakens the inference that the prior conduct reveals the person's present condition.

¶35 Beyond that, although I do not attempt to resolve D.C.'s constitutional claims, I conclude that to interpret the recency definition as instructing a court to engage in the fiction of treating factually distant events as if they had in fact occurred in the immediate past would run afoul of a command in *Foucha v. Louisiana*, 504 U.S. 71 (1992), and *Waupaca County v. K.E.K.*, 2021 WI 9, 395 Wis. 2d 460, 954 N.W.2d 366. The command is that the inquiry in a mental commitment proceeding must always be on whether the person is *currently* dangerous. If a factfinding court were required to affirmatively ignore the passage of time as having potential relevance in assessing the person's dangerousness, then the court would be assessing something other than present dangerousness. The County is correct that *Foucha* does not impose any particular evidentiary path toward showing current dangerousness. But this is not the same as saying that it permits a commitment based on a statutorily imposed legal fiction with large potential consequences.

¶36 In explaining its decision to commit D.C., the circuit court did not appear to regard WIS. STAT. § 51.20(1)(am) as requiring such a legal fiction. The court did not suggest that it was weighing the two incidents as if they had occurred more recently than they had. Further, in its order denying D.C.'s postconviction motion, the court expressly disclaimed reliance on the recency definition, saying that in its view, the disputed acts were "recent" with or without the application of § 51.20(1)(am).

¶37 I agree with the circuit court that the question of dangerousness under the second standard presented a "close call." But I conclude that, by the

16

time of the hearing, there was not sufficient evidence to show clearly and convincingly that D.C. was much more likely than not to pose a threat to others. I therefore reverse the order committing D.C. under this standard.

### C. The fifth standard

¶38 Regarding the fifth standard, the evidence was also not sufficient at least as to the third and fifth elements.[5] The third element requires that there be a "'substantial probability'" that the person "'needs care or treatment to prevent further disability or deterioration.'" ***Dennis H.***, 255 Wis. 2d 359, ¶22 (quoting WIS. STAT. § 51.20(1)(a)2.e.). Dr. Marcus's testimony in response to the question whether D.C. would likely deteriorate absent commitment, reproduced in full above, was entirely noncommittal. Dr. Black was also repeatedly asked about the likelihood of deterioration absent treatment, and he repeatedly answered to the effect that he did not think that D.C. would seek treatment in the community. It is true that it was relevant to deciding whether D.C. was dangerous under the fifth standard that D.C. was or was not competent to make the decision to seek or accept treatment for his mental illness. The second element of this standard asks whether the person is capable of making "'an informed choice as to whether to accept or refuse medication or treatment.'" ***Id.***, ¶21 (quoting § 51.20(1)(a)2.e.). But competency, or lack of competency, to refuse treatment is not the focus of the

---

[5] The circuit court determined that D.C. was dangerous under this standard both as the standard is written and as it is modified by the WIS. STAT. § 51.20(1)(am) provision that permits a dangerousness finding based on a substantial likelihood that "the individual would be a proper subject for commitment if treatment were withdrawn." On appeal, D.C. does not dispute that the County's evidence related to the fifth standard involved "recent acts or omissions." Further, he suggests that, in the context of this case, proof by recent acts and proof by the likelihood of dangerousness if treatment were withdrawn are equivalent. I accept that suggestion for purposes of my review.

17

third element.  Instead, the third element asks, if the person lacks treatment, what are likely to be the consequences to the person's condition?  Neither Dr. Marcus nor Dr. Black answered this question in a way that would support a finding that D.C. was likely to experience further disability or deterioration.

¶39    There was also a lack of evidence on the fifth element of the fifth standard.  This element asks, if the person is not treated, is the person substantially likely to "suffer severe mental, emotional, or physical harm that will result in the loss of the individual's ability to function independently in the community or the loss of cognitive or volitional control over his or her thoughts or actions"?  WIS. STAT. § 51.20(1)(a)2.e.  The same testimony noted in the preceding paragraph was the closest Dr. Black came to testifying that D.C. would likely suffer such harm.  Dr. Marcus, for his part, testified, "I believe [D.C.'s] nutrition would compromise and that he could put himself at risk in that way."  However, Dr. Marcus was relying on the fact that D.C. had missed an unspecified number of meals for unknown reasons while he was institutionalized.  Neither Dr. Marcus nor Dr. Black could provide context for the missing-meals topic aside from what was in the record, and both agreed they saw no indication that D.C. was underweight or "nutritionally compromised."

¶40    In sum, there was scant evidence that D.C. was likely to experience "'further disability or deterioration'" or that he would "'suffer severe mental, emotional, or physical harm.'"  *Dennis H.*, 255 Wis. 2d 359, ¶¶22, 24 (quoting WIS. STAT. § 51.20(1)(a)2.e.).  In view of the high bar that WIS. STAT. ch. 51 imposes—proof that such harms are "much more likely than not" shown by clear and convincing evidence—I conclude that the County did not show D.C. dangerous under the fifth standard.

18

### III. The evidence at the extension hearing was also insufficient.

¶41     At the extension hearing, only the fifth standard was at issue.[6]    I conclude that the testimony, while it arguably touched on each of the five elements of the fifth standard, was too general and conclusory to support a finding of D.C.'s dangerousness to the clear and convincing standard of proof. In particular, when asked about harms that could come to D.C., Dr. Dal Cerro testified that D.C. lacked "volition" and the ability to do "basic problem-solving," and needed "a high level of support." These are merely generic statements that could mean many things, some meeting the standard and some not meeting it. More concrete testimony was necessary to provide the circuit court with a sufficient basis to evaluate potential risk to a person in D.C.'s position, such as specific examples of D.C. having trouble fulfilling his basic needs, or an explanation as to how D.C.'s alleged lack of "volition" was likely to cause him serious mental, physical, or emotional harm as the statute requires.

¶42     The County argues that more specificity was not needed because the experts adequately conveyed that D.C.'s difficulties were profound and comprehensive. The County argues that their testimony established that "D.C. could not handle any necessary social or personal functions needed to meet the demands of ordinary life. How much detail is needed to expound upon 'none'?"

---

[6] As in his appeal from the initial hearing, D.C. here makes an argument in addition to the contention that the evidence was insufficient. He argues that a decision of our supreme court, *Portage County v. J.W.K.*, 2019 WI 54, 386 Wis. 2d 672, 927 N.W.2d 509, was wrongly decided, although he accurately acknowledges that this court is bound to follow it. *J.W.K.* stated that the reversal of a prior commitment does not affect the validity of a later commitment extension. *Id.*, ¶15. D.C. argues that if this court reverses his initial commitment order, the reversal of his initial commitment should be regarded as depriving the circuit court of competency to proceed as to the extension. Because I reverse the extension on grounds of insufficiency, and in any event would be bound by *J.W.K.*, I do not address this argument further.

But these are unwarranted elaborations on the actual testimony. Dr. Dal Cerro's testimony did not establish that D.C. "could not handle any necessary … functions." Instead, the testimony attributed to D.C. a general lack of "volition," merely repeating the statutory language regarding "loss of … volitional control over … thoughts or actions." WIS. STAT. § 51.20(1)(a)2.e. "[C]onclusory opinions parroting the statutory language without actually discussing dangerousness … are insufficient to prove dangerousness in an extension hearing." *Winnebago County v. S.H.*, 2020 WI App 46, ¶17, 393 Wis. 2d 511, 947 N.W.2d 761. This vague and generic testimony did not clear the bar required for commitment.

## CONCLUSION

¶43 For all of these reasons, I reverse the commitment orders entered in these cases. Because the orders for involuntary medication and treatment depend on the commitment orders for their validity, WIS. STAT. § 51.61(1)(g), I reverse them as well.

*By the Court.*—Orders reversed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.